**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE UNITED STATES OF AMERICA**,<br>ex rel.<br>**COREY RUSS**,<br>9604 Harvest Pond Avenue, Concord, North Carolina 28027,<br><br>and<br><br>**CHRIS MURPHY**,<br>244 South Street, Davidson, North Carolina 28036,<br><br>Plaintiff-Relators, | **DO NOT PLACE ON PACER**<br>**DO NOT SERVE DEFENDANTS**<br>**DO NOT PLACE IN PRESS BOX**<br><br>Case No. ____________________ |
| **BRINGING THIS ACTION ON BEHALF OF THE UNITED STATES OF AMERICA**<br>c/o **UNITED STATES ATTORNEY FOR THE EASTERN DISTRICT OF PENNSYLVANIA**<br><br>and<br><br>**MERRICK B. GARLAND ATTORNEY GENERAL OF THE UNITED STATES**<br><br>v. | |
| **NORTH AMERICAN RESCUE, LLC**,<br>Serve:<br>Corporation Service Company,<br>Registered Agent<br>251 Little Falls Drive<br>Wilmington, Delaware 19808,<br><br>and<br><br>**C-A-T RESOURCES, LLC**,<br>Serve:<br>Derek G. Thompson, Registered Agent | ORIGINAL COMPLAINT<br><br>FILED **UNDER SEAL**<br><br>PURSUANT TO<br><br>31 U.S.C. § 3730(b)(2)<br><br>JURY TRIAL DEMANDED |

485 Lakeshore Parkway
Rock Hill, South Carolina 29730

Defendants.

## COMPLAINT

1. Plaintiff-Relators Corey Russ ("Russ") and Chris Murphy ("Murphy") bring this qui tam action on behalf of the United States of America to recover damages and civil penalties arising from the actions of Defendants North American Rescue, LLC ("NAR") and C-A-T Resources, LLC ("CATR" and, collectively with NAR, "Defendants"). Defendants knowingly sold defective and misbranded medical equipment to the United States Department of Defense ("DoD"; the Government of the United States generally, including the DoD, shall be referred to as the "Government"), placing American military service members in grave peril while bilking millions from the public purse. Defendants have sold hundreds of millions of dollars' worth of Chinese-made medical goods to DoD while fraudulently misrepresenting their compliance with the made in America provisions of the Berry Amendment and the Trade Agreements Act. In all, Defendants have fraudulently obtained no less than $400 million from the Government, enriching themselves at the expense of American taxpayers and placing the safety of American soldiers who use the products at risk. (An "Index of Defined Terms" is appended to this Complaint for the reader's convenience.)

PARTIES AND JURISDICTION

2. Plaintiff-Relator Russ is a natural person domiciled in North Carolina. Russ's address is 9604 Harvest Pond Avenue, Concord, North Carolina 28027. Russ served as a combat medic in the United States Army Special Forces for more than 10 years, during which he was tasked with saving American lives under austere and extremely dangerous conditions in 35 countries. After leaving the Army, Russ founded Combat Medical Systems, LLC ("Combat Medical") and built a team of veteran combat medics, medical program managers and researchers with extensive experience in combat tactical medicine to provide American warfighters, police, firefighters and first responders with the very best tactical medical products in order to save lives. Russ currently serves as President of North America of Safeguard Medical, a company formed from the merger of Combat Medical with other providers of life-saving medical products and services.

3. Plaintiff-Relator Murphy is a natural person domiciled in North Carolina. Murphy's address is 244 South Street, Davidson, North Carolina 28036. Murphy served as a combat medic in the United States Army Special Forces for more than 10 years, during which he was tasked with saving American lives under austere and extremely dangerous conditions in many countries. After leaving the Army, Murphy worked at Combat Medical and built a team of veteran combat medics, medical program managers and researchers with extensive experience in combat tactical medicine to provide American warfighters, police, firefighters and first responders with the very best tactical medical products in

order to save lives. Murphy currently serves as consultant to Safeguard Medical, a company formed from the merger of Combat Medical with other providers of life-saving medical products and services.

4. Defendant NAR is a Delaware limited liability company whose principal place of business is 35 Tedwall Court, Greer, South Carolina 29650.

5. Defendant CATR is a South Carolina limited liability company whose principal place of business is 485 Lakeshore Parkway, Rock Hill, South Carolina 29730. Composite is the parent company of CATR.

6. This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

7. Venue in this Court is proper pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants transacts business in the Commonwealth of Pennsylvania. Alternatively, venue is appropriate because at least one of the Defendants committed an act proscribed by 31 U.S.C. § 3729 in the Commonwealth of Pennsylvania. Defendant NAR regularly sells and ships its products to federal, state and local government customers in this State as well as to private customers in this State. As set forth in ¶¶ 21-43 and the accompanying Exhibits 1-12, *infra*, NAR sells a substantial volume of goods to DoD each year. A large portion of NAR's sales to DoD are made under contracts administered by DLA Troop Support, whose headquarters is located at 700 Robbins Avenue, Philadelphia, Pennsylvania 19111 ("DLA Troop Support HQ"). DLA Troop Support HQ is located in this District. NAR interacts with DLA Troop

Support personnel located in this District as an inherent part of the business it does with DoD, including a substantial portion of the sales at issue in this Complaint.

8. Pursuant to 31 U.S.C. § 3730(b), Plaintiff-Relators have voluntarily provided the government with a pre-filing written disclosure containing substantially all information in support of the allegations in this Complaint. On or about April 10, 2019, Russ, along with Timothy Gallagher ("Gallagher") [1] of Kroll, Inc. ("Kroll")[2], met with agents of the FBI's Charlotte Field Office in connection with the matters alleged herein. During that April 10, 2019 meeting, Russ made a detailed presentation to the FBI agents present of all the information then known to Plaintiff-Relators concerning the matters alleged in this Complaint. Plaintiff-Relators have subsequently disclosed to the Government all the information in their possession concerning the matters alleged in this Complaint, including all information obtained by Plaintiff-Relators following their April 10, 2019 meeting with the FBI.

9. There has been no public disclosure of the allegations made in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4). To the extent

[1] Gallagher is Managing Director of Kroll. Prior to his role with Kroll, Gallagher served in multiple senior roles at the Federal Bureau of Investigation ("FBI") over twenty-two years, including Special Agent in Charge of the FBI's Newark Division, Chief of the Financial Crimes Section at FBI Headquarters; Special Agent in Charge, FBI Washington Field Office (Criminal Division); and Deputy Assistant Director of the FBI Criminal Investigative Division. Gallagher also served as a Special Agent of the Defense Criminal Investigative Service within DoD and as Special Agent for the National Aeronautics and Space Administration ("NASA").

[2] Plaintiff-Relators engaged Gallagher and Kroll to conduct a further investigation in connection with the matters described in this Complaint.

jurisdictionally required, Plaintiff-Relators are the original sources of the information contained in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4). Plaintiff-Relators have direct and independent knowledge of the information contained in this Complaint and have voluntarily provided that information to the Government.

10. This Complaint and all exhibits thereto are being filed in camera and under seal pursuant to 31 U.S.C. § 3730(b)(2) and Local Civil Rule 5.1.5(a)(1).

11. Plaintiff-Relators have complied with all conditions precedent to bringing this action.

## STATEMENT OF FACTS

### I. NAR Makes $400 Million from Sales to DoD

#### *a. NAR's Products at Issue*

12. NAR is a major supplier of medical devices to the Government. While NAR sells products to a number of federal agencies, state governments, local governments and private parties, its primary customer is DoD.

13. Among the products NAR regularly sells to DoD is the Combat Application Tourniquet ("CAT"), a tourniquet intended for use by first responders in battlefield or other emergency conditions. Since 2005, NAR has sold several versions, or "generations", of the CAT to the public and to the Government.

14. Prior to 2015, Composite Resources, Inc. ("Composite") held itself out to the public as the inventor and manufacturer of the CAT. In 2015, CATR was created as a subsidiary of Composite, after which CATR held itself out to the

public as the manufacturer of the CAT. NAR is listed on CATR's website as its exclusive distributor in the United States.

15. The current version of the CAT, the CAT Gen 7, consists primarily of two fabric straps, one nested within the other. The outer strap is fastened into an adjustable-width loop with Velcro and attached to a plastic buckle, which is used to place the tourniquet around an injured limb. The inner strap moves freely within the outer strap; one end of the inner strap protrudes from the outer strap and is attached to a plastic rod called a windlass, which is used to tighten the inner strap, halting blood flow to the injured limb.

16. As alleged more fully in Section II, *infra*, the CAT Gen 7 shares the same National Stock Number—the Government's unique identifier for each of the thousands of goods in its inventory—of the previous-generation CAT Gen 6 despite significant design changes that prevent Government personnel from using the two tourniquets interchangeably. Defendants caused the CAT Gen 7 to share the same NSN as the CAT Gen 6 as part of their deceptive scheme to introduce their new tourniquet design into the DoD's inventory without alerting DoD's procurement experts, sidestepping rigorous Government tests that might otherwise have revealed the CAT Gen 7's numerous flaws.

17. As alleged more fully in Section III, *infra*, both the CAT Gen 6 and CAT Gen 7 contain materials produced in the People's Republic of China ("China") and are manufactured in China. Defendants orchestrated a complex scheme to deceive DoD into accepting Chinese-made goods in violation of the Berry Amendment and the Trade Agreements Act ("TAA").

18. NAR also regularly sells a range of similar products variously referred to as "Compressed Gauze" or Wound Packing Gauze among other names. All of these products consist essentially of cloth medical gauze packaged in vacuum-sealed wrappers to reduce their volume. NAR claims its Compressed Gauze products are sterile.

19. Similarly, NAR sells products referred to as Emergency Trauma Dressings ("ETD"), which are bandages packaged in vacuum-sealed wrappers. NAR claims their Emergency Trauma Dressings are sterile.

20. NAR also sells a product called ARS Decompression Needle ("ARS Needle"), which is a type of needle used for treating certain types of emergency chest injuries. The ARS Needles are sold in sealed, non-permeable plastic cases. As with their ETD and Compressed Gauze products, NAR claims their ARS Needles are sterile.

21. Finally, NAR sells a product called the Casualty Immobilization System, referred to informally in the industry as "Spider Straps." Spider Straps consist of a set of fabric straps used to secure an injured person to a spinal board so they may be transported without aggravating any potential spine injuries they may have sustained.

22. As with the CAT, NAR's Compressed Gauze, ETD, and Spider Straps contain material produced in China and are manufactured in China. NAR regularly sells these products to DoD despite their Chinese origin and in violation of the Berry Amendment and the TAA. NAR convinces DoD to accept these

Chinese-made goods by deceiving DoD personnel into believing they are of American make.

*b. NAR Derives Majority of Revenues from Non-Public Sales to DoD*

23. NAR offers the CAT, Compressed Gauze and ETD for individual sale for the public and to government agencies. However, these products are sold to DoD most frequently as items included in medical kits. DoD and the military departments procure and maintain a wide range of medical kits to be carried in vehicles and aircraft as well as by individual service-members.

24. NAR derives millions of dollars of revenue per year from the sale of medical kits containing the CAT, Compressed Gauze and/or ETD to DoD. These sales—which include direct sales from NAR to DoD through contract vehicles such as the Electronic Catalog ("ECAT") as well as indirect sales through prime vendors, *see* ¶¶ 25-31, *infra*—constitute a majority of NAR's approximately $180 million annual revenue.

25. The full scope of the funds NAR obtains by selling medical kits[3] containing the CAT, Compressed Gauze and ETD is concealed from the public because relatively few such sales are made through traditional government contract channels that publicly report procurement activity.

26. DoD purchases a substantial majority of its medical supplies, including the medical devices it purchases from NAR, through the Defense

---

[3] As used throughout the Complaint, a "medical kit" is a collection of medical devices and supplies intended to be carried together in the field and used to provide first aid to injured persons before they can be moved to a specialized medical facility. These medical kits are commonly sold as a single unit pre-packaged in a carrying case or similar container.

Logistics Agency ("DLA"), and particularly through DLA Troop Support, a subordinate unit of DLA headquartered in Philadelphia, Pennsylvania.

27. DLA Troop Support purchases medical supplies primarily through two channels: the Medical and Surgical Prime Vendor Program ("PVP") and DLA Troop Support's ECAT.

28. Under PVP, DLA contracts with a small number of "prime vendors" to provide a catalog of brand-name products on demand to DLA Troop Support's "customers," military units or other agencies within DoD that request the medical products in question. To facilitate this arrangement, DLA negotiates Distribution and Pricing Agreements ("DAPAs") with suppliers to prime vendors. DAPAs specify the products available for acquisition from suppliers through the prime vendor and set a price at which the prime vendor will sell each product to the Government.

29. The contracts DLA makes with the prime vendors under PVP are public and are made using traditional government contract channels. However, DLA's purchases of equipment from suppliers through prime vendors are not made public, either individually or in aggregate. Similarly, the prime vendors' purchases of equipment to fill DLA's orders are private agreements and are therefore not public. Thus, while DLA makes the majority of its medical equipment purchases through PVP, the amount that DLA purchases of any particular medical item, or the amount that any company such as NAR earns from DLA's patronage, is not released to the public. Those sales that are made public appear in electronic databases maintained by the Government.

30. Like PVP, ECAT is a program maintained by DLA that allows units within DoD to place orders for a catalog of brand-name products at a pre-negotiated price. Unlike PVP, orders placed through ECAT are not mediated through prime vendors. Instead, ECAT orders are placed directly with distributors for those products that have been approved for the program.

31. Unlike PVP orders, ECAT orders are publicly accessible in an aggregate format.

32. Products sold to DoD units through PVP or ECAT are shipped directly from the relevant supplier to end users and do not pass through intermediate warehouses maintained by DLA or other DoD procurement authority. As such, neither DLA nor any other DoD procurement professionals have an opportunity to inspect goods sold through PVP or ECAT before they reach the DoD unit that initiated the order for those goods.

33. In line with DLA's general practice, most of the products NAR sells to DoD are sold either through a prime vendor under PVP or directly to DoD units via ECAT. A minority of NAR's sales to DoD occur through traditional federal contracting channels. The remainder of NAR's DoD sales occur through a variety of specialized contract channels, including some managed by agencies within DoD other than DLA.

34. Attached hereto as **Exhibit 1** is a true and correct copy of a report[4] detailing the Government's purchases of the CAT as a stand-alone item through

---

[4] The reports discussed in Section I.b are prepared by BidLink Software Systems ("BidLink"). BidLink is a service that automatically accesses the Government's

publicly accessible channels. Between 2015 and the present date, the Government paid a total of $7,286,779.82 to purchase the CAT as a stand-alone item through these publicly accessible channels. Exhibit 1 sets forth the date, contract number, price and quantity of each such purchase, as well as the name of the Government's direct counterparty for each purchase. All of the CATs purchased by the Government were ultimately provided to the Government by Defendants, either directly or through third-party distributors. Defendants at all times knew the CATs they sold to these third-party distributors would subsequently be purchased by the Government.

35. Attached hereto as **Exhibit 2** is a true and correct copy of a report detailing the Government's purchases of the Individual First Aid Kit Refill ("IFAK Refill"). The IFAK Refill is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $3,840,576.80 to purchase the IFAK Refill. Exhibit 2 sets forth the date, contract number, price and quantity of each such purchase. All of the IFAK Refills were sold to the Government by Southeastern Kentucky Rehabilitation Industries, Inc. ("SEKRI"), which assembles the IFAK Refills from component medical devices SEKRI purchases from a number of other companies. NAR sold all of the CATs included in the IFAK Refills to SEKRI. Defendants were at all times aware that the CATs sold by NAR to SEKRI and included in the IFAK Refills would in turn be sold by SEKRI to DoD.

---

publicly accessible databases of contract awards and presents the information in those databases in an easier-to-understand format.

36. Attached hereto as **Exhibit 3** is a true and correct copy of a report detailing the Government's purchases of the Individual First Aid Kit Generation II Refill ("IFAK II Refill"). The IFAK II Refill is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $1,715,704.92 to purchase the IFAK II Refill. Exhibit 3 sets forth the date, contract number, price and quantity of each such purchase. All of the IFAK II Refills were sold to the Government by SEKRI, which assembles the IFAK II Refills in substantially the same manner as the IFAK Refills. NAR sold all of the CATs included in the IFAK II Refills to SEKRI. Defendants were at all times aware that the CATs sold by NAR to SEKRI and included in the IFAK II Refills would in turn be sold by SEKRI to DoD.

37. Attached hereto as **Exhibit 4** is a true and correct copy of a report detailing the Government's purchases of the Maritime Assault Kit ("MAK"). The MAK is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $350,221.85 to purchase the MAK. Exhibit 4 sets forth the date, contract number, price and quantity of each such purchase as well as the name of the Government's direct counterparty for each purchase. All the MAKs purchased by the Government were ultimately provided to the Government by Defendants, either directly or through third-party distributors. Defendants at all times knew the MAKs they sold to these third-party distributors would subsequently be purchased by the Government.

38. Attached hereto as **Exhibit 5** is a true and correct copy of a report detailing the Government's purchases of the Warrior Aid and Litter Kit ("WALK") in a MultiCam pattern.[5] Attached hereto as **Exhibit 6** is a true and correct copy of a report detailing the Government's purchases of the WALK in Coyote Brown color. The WALK is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $2,408,771.42 to purchase the WALK. Exhibits 5 and 6 set forth the date, contract number, price and quantity of each such purchase as well as the name of the Government's direct counterparty for each purchase. All the WALKs purchased by the Government were ultimately provided to the Government by Defendants, either directly or through third-party distributors. Defendants at all times knew the WALKs they sold to these third-party distributors would subsequently be purchased by the Government.

39. Attached hereto as **Exhibit 7** is a true and correct copy of a report detailing the Government's purchases of the Combat Life Saver kit ("CLS"). The CLS is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $849,700.29 to purchase the CLS. Exhibit 7 sets forth the date, contract

[5] MultiCam is a camouflage pattern developed for use by the Army. Kits such as the WALK are typically packaged in a fabric storage bag that can be made in multiple colors or patterns. Note that, as evident on the face of Exhibits 5 and 6 respectively, WALKs packaged in a MultiCam-patterned bag are assigned a different NSN (6545-01-532-4962) than otherwise-identical WALKs packaged in a Coyote Brown-colored bag. This is consistent with the standard DoD practice of assigning a separate NSN for each variation of a kit or other object, even when such variations are limited to color or pattern.

number, price and quantity of each such purchase as well as the name of the Government's direct counterparty for each purchase. All the CLSs purchased by the Government were ultimately provided to the Government by Defendants, either directly or through third-party distributors. Defendants at all times knew the CLSs they sold to these third-party distributors would subsequently be purchased by the Government.

40. Attached hereto as **Exhibit 8** is a true and correct copy of a report detailing the Government's purchases of the Universal First Aid Kit ("UFAK"). The UFAK is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $8,256,372.86 to purchase the UFAK. Exhibit 8 sets forth the date, contract number, price and quantity of each such purchase. Substantially all[6] of the UFAK were sold to the Government by SEKRI, which assembles the UFAK in substantially the same manner as the IFAK Refills. NAR sold all of the CATs included in the UFAK to SEKRI. Defendants were at all times aware that the CATs sold by NAR to SEKRI and included in the UFAK would in turn be sold by SEKRI to DoD.

41. Attached hereto as **Exhibit 9** is a true and correct copy of a report detailing the Government's purchases of the Individual First Aid Kit II ("IFAK

---

[6] As noted in Exhibit 8, a single Government order for 28 UFAKs was filled by "Tqm, Llc" rather than SEKRI. *See* Exhibit 8 at 4. This company, which does business under the name "Two Rivers Medical", is a subsidiary of NAR. *See id.* at 12 (noting "TQM, LLC" is a "Division" of "North American Rescue LLC," i.e. of NAR.)

II")[7]. The IFAK II is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $1,430,131.54 to purchase the IFAK II. Exhibit 9 sets forth the date, contract number, price and quantity of each such purchase. All of the IFAK IIs were sold to the Government by SEKRI, which assembles the IFAK IIs in substantially the same manner as the IFAK Refills. NAR sold all of the CATs included in the IFAK II to SEKRI. Defendants were at all times aware that the CATs sold by NAR to SEKRI and included in the IFAK II would in turn be sold by SEKRI to DoD.

42. Attached hereto as **Exhibit 10** is a true and correct copy of a report detailing the Government's purchases of the U.S. Coast Guard pattern Individual First Aid Kit ("USCG IFAK") in Coyote Brown color. Attached hereto as **Exhibit 11** is a true and correct copy of a report detailing the Government's purchases of the USCG IFAK in Black color. The USCG IFAK is a medical kit composed of a number of medical devices including, *inter alia*, the CAT intended to meet the specifications of the United States Coast Guard. Between 2015 and the present date, the Government paid a total of $216,545.24 to purchase the USCG IFAK. Exhibits 10 and 11 set forth the date, contract number, price and quantity of each such purchase as well as the name of the Government's direct counterparty

[7] Note the IFAK II discussed in this ¶ 38 and Exhibit 9 is distinct from the IFAK II Refill discussed in ¶ 33, *supra*, and Exhibit 3.

for each purchase. Substantially all[8] the USCG IFAKs purchased by the Government were sold by NAR or its subsidiaries.

43. Attached hereto as **Exhibit 12** is a true and correct copy of a report detailing the Government's purchases of the General First Aid Kit ("GFAK"). The GFAK is a medical kit composed of a number of medical devices including, *inter alia*, the CAT. Between 2015 and the present date, the Government paid a total of $12,390.60 to purchase the GFAK. Exhibit 12 sets forth the date, contract number, price and quantity of each such purchase. All of the GFAKs were assembled by The Resource Center ("TRC") from component medical devices TRC purchases from a number of other companies. NAR sold all of the CATs included in the GFAKs to TRC. TRC in turn sold the GFAKs to third-party distributors who then sold the GFAKs to the Government. Defendants were at all times aware that the CATs sold by NAR to TRC and included in the GFAKs would in turn be sold to DoD.

44. As set forth in the preceding Paragraphs 31-40, contract data made available by the Government shows the Government spent no less than $26,367,195.34 between 2015 and the present to purchase the CAT and medical kits containing the CAT. As previously noted, these publicly available transactions represent only a small portion of DoD's purchases of the CAT and

[8] Exhibit 11 notes a single order for 6 USCG IFAKs was filled by SZY Holdings, LLC, which does business as EverReady First Aid ("EverReady"). *See* Exhibit 11 at 2, 11. EverReady is a distributor of, *inter alia*, NAR products. The USCG IFAKs sold to the Government by EverReady were supplied to EverReady by NAR. Defendants at all relevant times knew the USCG IFAKs supplied to EverReady would subsequently be purchased by the Government.

medical kits containing the CAT. The majority of DoD's purchases of the CAT and medical kits containing the CAT take place through procurement channels that are not publicly disclosed.

45. Upon information and belief, between 2015 and the present date, NAR received approximately $400 million in revenue from sales of the CAT, Compressed Gauze, ETD, ARS Needles or the Spider Straps and medical equipment sets containing the CAT, Compressed Gauze, ETD, ARS Needles or the Spider Straps to the Government. Upon information and belief, from 2015 through the present, NAR has achieved an average annual revenue of approximately $184 million. Upon information and belief, NAR derives approximately 36 percent of its annual revenue, or $66,240,000 on average, from sales, direct or indirect, of the CAT and medical kits containing the CAT to the Government.

## II. NAR Substitutes an Untested New CAT without the Government's Knowledge

### *a. DoD Begins Tests to Select New Tourniquets; CAT Gen 6 Performs Poorly in Initial Tests*

46. In 2004, the U.S. Army ("Army") determined it had a need for a purpose-built tourniquet to issue to soldiers serving in Iraq and Afghanistan. Existing tourniquets in military use—including a simple cravat wound with a stick and a strap-and-buckle design dating to the American Civil War—were not adequate to meet the demands of then-current battlefield conditions. The Army tested several commercially-available designs to meet this requirement.

47. In March 2005, the Army Surgeon General selected the third-generation CAT ("CAT Gen 3") as the primary tourniquet to be issued to soldiers as part of the Individual First Aid Kit ("IFAK"). The Army Surgeon General also selected another commercially-available tourniquet, the first-generation Special Operations Forces Tactical Tourniquet ("SOFTT"), for inclusion in IFAKs when sufficient CATs were not available. The Surgeon General's decision was documented and distributed to the Army in an "ALARACT" (for "ALl ARmy ACTivities") message designated ALARACT 066-2005, which is no longer active.

48. By 2009, the Army had become aware of significant performance issues with the CAT. By 2010, the service branches of the U.S. military determined an improved tourniquet design was necessary. The services formed a Tourniquet Working Group to establish requirements for an improved tourniquet and implemented those requirements through a series of tests called the Joint Operational Evaluation of Field Tourniquets ("JOEFT").

49. At this time, the Army and other DoD service branches fielded the sixth-generation CAT ("CAT Gen 6") as the tourniquet included in their medical kits, including IFAKs and vehicle-borne kits.

50. As with all products purchased by DoD, the CAT Gen 6 was assigned a National Stock Number ("NSN"), 6515-01-521-7976. This NSN serves as a unique identifier for the CAT Gen 6 and also contains certain basic information about the category the CAT Gen 6 falls under. Among other uses, DoD units identify medical devices they wish to purchase or field by their NSNs to ensure they obtain and use precisely the devices they intend.

51. The JOEFT tests commenced in 2012 and were planned to be conducted in three distinct phases. The JOEFT tests initially included the CAT Gen 6 as well as twelve other commercially available tourniquets designed to fill the same operational role as the CAT.

52. Phase I of the JOEFT tests, which evaluated tourniquets under laboratory conditions for basic design characteristics as well as their functionality, safety and efficacy, concluded in 2012. Nine of the thirteen tourniquets tested in Phase I were selected for Phase II tests.

53. Phase II of the JOEFT tests involved the participation of volunteers who tested the use of tourniquet designs on mannequins in simulated field conditions. The Phase II tests were completed in 2014.

54. The CAT Gen 6 performed poorly in the first two phases of JOEFT testing relative to several competing designs. While the CAT Gen 6 was not eliminated from JOEFT testing after the Phase II tests, its poor performance in testing placed it in jeopardy of elimination at the conclusion of the final tests. If that occurred, the CAT would lose the imprimatur of being the tourniquet favored by the U.S. Army and DoD more broadly, and NAR would have lost the opportunity to earn substantial revenue selling the CAT to DoD.

*b. Defendants Develop CAT Gen 7, Which Introduces New Problems*

55. No later than 2014, Defendants were aware of the CAT Gen 6's poor performance in the JOEFT tests. Defendants were also aware of field reports where CAT Gen 6 tourniquets broke during use under emergency conditions, forcing field medics to resort to techniques such as manipulating pressure points

to stem bleeding while they located working CATs. These reports were also brought to the attention of the Committee on Tactical Combat Casualty Care ("CoTCCC"), a panel of experts on emergency medical care organized by DoD to make recommendations on best practices and medical equipment for use by DoD units.

56. In an attempt to preserve their product's favored position among DoD customers, Defendants developed the seventh-generation CAT ("CAT Gen 7") to replace the CAT Gen 6 both for purposes of the JOEFT tests and as a commercial product.

57. By substituting the CAT Gen 7 for the CAT Gen 6 in the middle of the JOEFT tests, Defendants intended to avoid subjecting the CAT Gen 7 to the rigorous Phase I and Phase II tests that the CAT Gen 6 had fared poorly in. As described more fully in Section II.c, *infra*, Defendants accomplished this bait-and-switch by using the same NSN for both the CAT Gen 6 and CAT Gen 7; Defendants purposely confused the Government's procurement efforts to conceal their substitution of the CAT Gen 7 for the CAT Gen 6.

58. As an essential element of their fraudulent substitution scheme, Defendants took advantage of the fact that the CAT Gen 6 and CAT Gen 7 are nearly indistinguishable from one another except upon close inspection, especially because the CAT Gen 7 is packaged in a way that conceals most of its distinguishing features. *See* ¶ 65, *infra*.

59. The CAT Gen 7 includes a number of material design changes from the CAT Gen 6. Most notably, where the CAT Gen 6 incorporated a buckle with

two openings, enabling the user to route the strap through the buckle twice, the CAT Gen 7's buckle has only a single opening and is designed such that the user can only route the strap through the buckle once. To secure the strap without using a double-route buckle, NAR designed a Velcro fastener.

60. While the CAT Gen 7 was later marketed by Defendants as an improvement over the CAT Gen 6, it in fact introduced a number of new problems that were not present in the CAT Gen 6.

61. Most seriously, the CAT Gen 7 is prone to slipping out of position or spontaneously releasing tension either while being applied or after application. The CAT Gen 6's double-route buckle provided additional support to hold the tourniquet's strap in place, rather than relying solely on the strap's Velcro to secure the CAT on the wounded person's limb. The CAT Gen 7 lacks that feature and consequently relies entirely on its Velcro strap to stay in place. This is inadequate in field usage, particularly where a wounded person needs to be dragged or moved along the ground after the CAT Gen 7 is applied.

62. After DoD learned that Defendants substituted the CAT Gen 7 for the CAT Gen 6 (*see* Section II.c, *infra*), it implemented guidance to ameliorate this problem that provided the CAT Gen 7 should be secured with tape after being applied, a step that was not recommended for the CAT Gen 6. This DoD guidance reflects the Government's recognition that the CAT Gen 7 is unsafe and prone to failure.

63. The CAT Gen 7 is prone to inadequately stopping bleeding when applied. This problem is also due to the use of a single-opening buckle, which is

more difficult to pull taut over an injured limb than the CAT Gen 6's double-opening buckle enabled. If the CAT Gen 7 is not pulled taut before the user begins to tighten its strap with the windlass, it frequently fails to completely stop blood flow to the injured limb.

64. The CAT Gen 7's design also imposes mechanical limits on the extent to which it can be tightened with the windlass due to the interaction of its inner and outer straps. These limits can also cause the CAT Gen 7 to fail to completely stop blood flow. To ameliorate these problems, DoD guidance, beyond recommending the CAT Gen 7 be secured with tape, also recommends using multiple tourniquets on the same injured limb if the first tourniquet applied cannot be completely tightened. This recommendation also reflects DoD's recognition that the CAT Gen 7 is unsafe and prone to failure.

65. Beyond its numerous design defects, the CAT Gen 7's significant design changes from the CAT Gen 6 pose challenges to military end-users. If a person who has been trained to operate the CAT Gen 6 attempts to use the CAT Gen 7 in a like manner they will be unable to successfully apply the tourniquet. Proper and safe adoption of the CAT Gen 7 by DoD would therefore require DoD to implement a new training regimen to instruct its personnel on the use of the new tourniquet.

66. The CAT Gen 6 and CAT Gen 7 deceptively share the same NSN, are very similar in their outward appearance and packaging, and are distinguishable only upon close inspection. *See* ¶ 72, *infra*. The only visible difference between a CAT Gen 6 and CAT Gen 7 in their original packaging is the color of the windlass

retaining strap; the CAT Gen 6 has a white strap while the CAT Gen 7 has a light gray strap. Even unpackaged, the only visible differences between the CAT Gen 6 and CAT Gen 7 are subtle changes to the buckle and windlass as well as changes to the logo printed on the strap. As such, a DoD end user who is trained only on the CAT Gen 6 but who was issued with an improperly-substituted CAT Gen 7 (*see* Section II.c, *infra*) may not realize they were issued a tourniquet they have not been trained to use until they are required to actually use the tourniquet in an emergency – at which point it is too late to receive training in the use of the CAT Gen 7.

c. *Defendants Substitute CAT Gen 7 for CAT Gen 6 Without DoD's Knowledge*

67. Beginning on or about November 6, 2015, Defendants filled orders for the CAT Gen 6 with the CAT Gen 7. This substitution occurred in orders DoD units made directly with NAR via ECAT. This substitution also occurred for orders NAR received from prime vendors. Defendants at all times knew that CAT Gen 7s provided to prime vendors would in turn be sold to DoD.

68. At the time Defendants began to substitute the CAT Gen 7 for the CAT Gen 6, the CAT Gen 7 was a new product that had not undergone the first two phases of JOEFT testing as previously described, nor had it undergone any external or public testing.

69. While evidently NAR designed the CAT Gen 7 supposedly to be an improvement in terms of speed and simplicity over the CAT Gen 6, NAR made no information available to the Government or other prospective purchasers about the CAT Gen 7's safety or efficacy. As was later discovered, the CAT Gen 7 in fact

had serious problems along both metrics, problems the Government and the public at large were not aware of and could not have known about.

70. To facilitate substituting the CAT Gen 7 for the CAT Gen 6 without alerting DoD to the switch, Defendants intentionally marked the new CAT Gen 7s with the same NSN originally issued for the CAT Gen 6 even though the two devices had different form, fit and function and cannot be operated in the same manner as one another.

71. A basic principle of the Federal Logistics Information System ("FLIS"), of which NSNs are an integral piece, is that each "item of supply" purchased or maintained by Government agencies is associated with exactly one unique identifier (such as an NSN), and likewise each NSN is associated with exactly one item of supply. *See* FLIS Technical Procedures, vol. 4, § 4.1.1(a).[9] Defendants violated this basic principle of Government procurement and logistics by intentionally marking the CAT Gen 7 with the same NSN used to identify the CAT Gen 6 and by filling orders for the CAT Gen 6 with CAT Gen 7s.

72. Because the use of unique identifiers such as NSNs is a basic principle of Government procurement and logistics, Defendants' use of the same NSN for both the CAT Gen 6 and the CAT Gen 7 enabled them to substitute the CAT Gen 7 for the CAT Gen 6 without alerting Government purchasers that they had not received the tourniquets they intended to buy. Government inventories conflated the CAT Gen 6 and CAT Gen 7 because they shared the same NSN.

---

[9] DLA maintains a complete and publicly-accessible set of FLIS Technical Procedures at https://www.dla.mil/HQ/LogisticsOperations/TrainingandReference/FLISProcedures/.

73. The CAT Gen 6 and CAT Gen 7 also share a similar outward appearance; while the CAT Gen 7 includes a number of significant design changes impacting its efficacy and mode of operation, these changes are not necessarily apparent except upon close inspection of, e.g., the tourniquet's buckle, and such inspection can only be made after opening the tourniquet's packaging. To the casual observer who only sees the tourniquet in its packaged form, it is not obvious whether the tourniquet is a CAT Gen 6 or a CAT Gen 7. Further compounding these difficulties, CATs are frequently sold packaged together with a number of other medical devices as unified medical kits, impeding close inspection of individual tourniquets that are part of the kits.

74. As a result of Defendants' deceptive use of the same NSN for both the CAT Gen 6 and CAT Gen 7, DoD units who received the CAT Gen 7, rather than the CAT Gen 6 they had ordered, were not aware they had been provided with an inadequately tested tourniquet of a materially different design and function until several months after they began to receive those tourniquets.

75. Defendants' unannounced substitution of the CAT Gen 7 for the CAT Gen 6 immediately led to problems among the military services who unknowingly received the CAT Gen 7 when they believed they had received the CAT Gen 6.

76. The U.S. Army Medical Materiel Agency ("USAMMA"), the component of the Army responsible for managing logistics programs concerning medical materiel sets and kits, did not become aware that Defendants had substituted the CAT Gen 7 for the CAT Gen 6 until March 10, 2016, more than four months after the fact.

77. Once United States Air Force ("Air Force") personnel became aware of the switch from the CAT Gen 6 to the CAT Gen 7, they contacted Defendants directly in an attempt to acquire the CAT Gen 6 tourniquets they originally intended to purchase rather than the CAT Gen 7 tourniquets Defendants substituted. As of April 1, 2016, the Air Force was still attempting to determine whether they were in fact receiving CAT Gen 6 tourniquets rather than the substitute CAT Gen 7.

78. In the United States Marine Corps ("Marine Corps"), CAT Gen 7s were unknowingly deployed to units in the field. Marines in the field who received CAT Gen 7s reported them as counterfeit goods.

79. Upon learning that Defendants substituted the CAT Gen 7 for the CAT Gen 6 without notifying the relevant Army personnel, USAMMA staff investigated the extent to which other DoD units had unknowingly received the CAT Gen 7 as well as whether any unit within the Army was aware of the CAT Gen 7's existence.

80. On April 1, 2016, USAMMA published a Medical Materiel Quality Control Message ("MMQC") designated MMQC-16-1284 informing other DoD personnel of their findings with respect to the substitution of the CAT Gen 7 for the CAT Gen 6.

81. In MMQC-16-1284, USAMMA staff informed DoD personnel that NAR unilaterally replaced the CAT Gen 6 with the CAT Gen 7 without informing USAMMA. USAMMA staff highlighted Defendants' derogation of basic principles of Government logistics practice, observing "[Defendants] continued to use the

same part number and NSN for both generations of the tourniquet even though there are significant differences."

82. USAMMA staff also noted that service members had "extremely limited training" on the differences between the CAT Gen 6 and CAT Gen 7. They warned that soldiers who received the CAT Gen 7 may not be able to adequately render first aid in case of emergency because of their unfamiliarity and lack of training with the CAT Gen 7.

83. MMQC-16-1284 listed 42 medical equipment assemblages or kits containing CAT tourniquets in use by the Army. Because of Defendants' use of the same NSN for the CAT Gen 6 and CAT Gen 7, Army personnel would be required to inspect these assemblages personally and in detail to determine which version of the CAT they received and therefore which set of operating instructions they would be required to follow in an emergency.

84. USAMMA staff further noted no data existed showing the CAT Gen 7 was genuinely an improvement over, or even the equal of, the CAT Gen 6. While Defendants submitted the CAT Gen 7 to the Phase III JOEFT tests in place of the CAT Gen 6, the CAT Gen 7 was never subjected to the JOEFT Phase I or Phase II tests. The JOEFT tests involving the CAT Gen 7 would not be published until March 2017, over a year after Defendants substituted the CAT Gen 7 for the CAT Gen 6.

85. As noted in Section II.b, *supra*, the CAT Gen 7 has a number of design flaws that create safety risks and operational difficulties that were not present in the CAT Gen 6. The full scope of the problems Defendants introduced

by improperly substituting the inferior CAT Gen 7 for the CAT Gen 6 have not been systematically explored because the CAT Gen 7 was never subjected to the Phase I or Phase II JOEFT tests. Instead, DoD personnel have been forced to use crude improvisations to compensate for the CAT Gen 7's shortcomings, including securing tourniquets to wounded soldiers' bodies with tape or applying multiple tourniquets to a single wounded limb.

86. As observed in MMQC-16-1284, CoTCCC[10] had not made any recommendation as to the use of the CAT Gen 7 as of April 1, 2016. While CoTCCC's recommendations are not binding on DoD units, the recommended medical devices lists it produces are highly influential within DoD.

87. The authors of MMQC-16-1284 acknowledged the Army Institute of Surgical Research was aware of the existence of the CAT Gen 7 because "an experiment" involving the CAT Gen 7 was conducted at that agency.

88. In MMQC-16-1284, USAMMA advised Army personnel to study the instructions for both the CAT Gen 6 and CAT Gen 7 to ensure they could use both tourniquets. This advice was necessary because Army personnel could not be certain whether they had been issued a CAT Gen 6 or CAT Gen 7 because of Defendants' deceptive actions.

89. MMQC-16-1284 also provided that Air Force personnel should audit the tourniquets in their possession to determine whether they possessed the CAT Gen 6 or CAT Gen 7 and then report their findings to the Air Force First Aid Kit Program Manager.

---

[10] *See* ¶ 55, *supra*.

90. There remains to this day widespread confusion among military end users about which version of the CAT they have been issued with and how to properly use it. DoD units have not been able to consistently identify or sort their stock of CAT Gen 6s from the CAT Gen 7s in their possession because Defendants improperly and deceptively sold both tourniquets to DoD under the same NSN.

91. NAR continues to misleadingly claim to the Government and the public at large that the CAT Gen 7 has been fully tested despite NAR's deliberate and successful effort to avoid ever subjecting the CAT Gen 7 to the JOEFT Phase I and Phase II tests.

## III. Defendants Deceived DoD Into Accepting Chinese-Made Goods In Violation of Berry Amendment and Trade Agreements Act

### *a. Selling Chinese-Made Goods to DoD Violates Berry Amendment and Trade Agreements Act*

92. Congress has enacted a multitude of laws requiring the Government to purchase goods produced in the United States or certain of its favored trading partners. Since their enactment, these so-called domestic preference laws have furthered Congress's intent that the Government's patronage inures to the benefit American workers and businesses while simultaneously ensuring that the Government reaps the full benefits of America's skilled workforce and world-leading industry.

93. Among the domestic preference laws enacted by Congress are the Trade Agreements Act of 1979, 19 U.S.C. § 2511 *et seq.* ("Trade Agreements Act" or "TAA"), and the Berry Amendment, 10 U.S.C. § 2533a.

94. The Berry Amendment prohibits DoD from procuring any item within its ambit unless it is "grown, reprocessed, reused, or produced in the United States." 10 U.S.C. § 2533a(a).

95. The Berry Amendment is implemented by Section 225.7002 of the Defense Federal Acquisition Regulation Supplement ("DFARS"), codified as Title 48, chapter 2 of the Code of Federal Regulations, which provides in general that DoD may not purchase food, clothing, textiles or hand tools, "either as end products or components," unless they were grown, reprocessed, reused or produced in the United States. *See* DFARS § 225.7002(a).

96. The Trade Agreements Act is in essence an exception to or liberalization of the Buy American Act, 41 U.S.C. § 8301 *et seq.*, which generally requires the Government to purchase products and components manufactured and produced in the United States. *See* 41 U.S.C. § 8302. TAA provides that, for procurements whose value exceeds $193,000 (or a lower threshold established by specific trade agreements), the Government may also purchase goods and services from certain countries designated by the President without running afoul of the federal procurement laws. TAA is implemented by Part 25 of the Federal Acquisition Regulation ("FAR"), codified as Title 48, chapter 1 of the Code of Federal Regulations.

97. Separately, Section 304 of the Tariff Act of 1930 (codified as amended at 19 U.S.C. § 1304) requires all "article[s] of foreign origin" to be labeled with their country of origin either on the product itself or on its container.

98. Crucially, while the goods and services of many countries are available to the Government for purchase under the Trade Agreements Act, China is not a "designated country" under TAA. The Government remains barred from purchasing Chinese-made goods and services. *See* FAR § 25.003 (defining "designated country").

99. DoD treats its obligations under TAA and the Berry Amendment with the utmost seriousness. DLA regularly refuses to permit DoD and its component units to purchase goods when it is aware such goods do not fully comply with TAA or the Berry Amendment. DLA forbids such items from placement in a DAPA (making it unavailable for DoD purchase through PVP) or ECAT even if its non-compliance with TAA or the Berry Amendment is limited to a single sub-component of the item. The DoD Office of Inspector General ("DoD IG") regularly monitors DLA and other DoD unit procedures to ensure DoD discharges its obligations not to purchase items that do not comply with the domestic preference laws including TAA and the Berry Amendment

*b. Defendants Import Large Volume of Products Covered by Berry Amendment from China*

100. Between 2018 and 2020, U.S. Customs and Border Patrol ("CBP") recorded multiple shipments from companies located in East Asia to NAR's headquarters at 35 Tedwall Court, Greer, South Carolina.

101. During this period, CBP recorded shipments totaling more than 25 tons of textile products to NAR from China Surgical Dressings Center Co. ("China Surgical Dressings"), a company headquartered in Changhua City, Taiwan and specializing in the production of cloth medical products such as bandages, gauze

and facemasks. China Surgical Dressings maintains a manufacturing facility in Dongguan, China. The shipments NAR received from China Surgical Dressings consisted of medical bandages, gauze, wadding and similar articles. Some of these shipments originated in Taiwan but at least one shipment from China Surgical Dressings to NAR originated in Ningbo, China.

102. From 2015 through the present, NAR has received a large volume of goods from a company called Golden Season PTE, Ltd. ("Golden Season"). Golden Season holds itself out to the public as a manufacturer of a wide range of products and as being located in Singapore. However, Golden Season is not registered with the Singapore government as a manufacturer. Instead, Golden Season is registered in Singapore as a warehouse and wholesale trader.

103. The products Golden Season sells in the course of its business as a warehouse and wholesale trader, including the products it sells to NAR, are produced in China.

104. NAR is aware Golden Season's products originate in China rather than Singapore because on several instances Golden Season has shipped goods to NAR directly from China rather than routing them through Singapore.

105. On November 16, 2015, NAR purchased a shipment of litter stands, field hospital beds, litter carriers and "Raptor Securing Bands" from Golden Season. Golden Season shipped these goods to NAR from the Port of Yantian, which is a deep-water port in Shenzhen, China.

106. Golden Season maintains a website advertising each of the products NAR purchased from it on November 16, 2015. Golden Season's website

advertises these products as particularly appropriate for military or combat use. Golden Season's website advertises many of these products using the same brand names, including "MedEvac" and "Raptor", that NAR uses to sell the same products in the United States, including to DoD.

107. Golden Season's website refers explicitly to NAR in connection with several of the products it manufactures in China. The entry on Golden Season's website for the "Raptor Securing Bands" NAR purchased from it in 2015 also refer to the same device as the "NAR IV Securing Device". Golden Season's website also advertises a "NAR Hypothermia Prevention and Management Kit". NAR advertises the same product to American customers under precisely the same name.

108. Between February 2018 and May 2020, CBP recorded no fewer than twelve separate shipments of emergency blankets from Golden Season to NAR. These shipments originated in Shanghai, China and Ningbo, China. Golden Season advertises this product on its website as the "Golden Season Thermal Blanket"; NAR advertises an identical product as the "NAR Survival Blanket".

109. From 2011 through the present, NAR has imported no fewer than 57 shipments of medical equipment, including nylon bands and gauze, from Golden Season. NAR continues to import goods originating in China on a regular basis.

*c. Defendants Employ Complex Repackaging Scheme to Sell Chinese-Made CATs to the Army Deceptively Labeled "Made in U.S.A."*

110. As with the other Chinese-made goods NAR purchases from Golden Season, Golden Season advertises the CAT on its website. Golden Season's

description of the CAT matches NAR's description of the CAT on its own website nearly word for word, including references to specific U.S. Patent numbers and the slogan "Official Tourniquet of the U.S. Army".

111. On or about January 25, 2021, Plaintiff-Relators' agents observed a box filled with CATs ("Fort Bragg Box") in a supply room in Fort Bragg, an Army facility in Fayetteville, North Carolina.

112. The Fort Bragg Box bore a number of shipping labels. One label was printed with NAR's logo and stated "Ship to" the address of NAR's headquarters in Greer, South Carolina. No shipper is identified on this label; the only company referenced is NAR itself. This label also states "1 of 40" and "250 Tourniquets".

113. A second label indicated the Fort Bragg Box had been shipped to Fort Bragg by NAR from its address in Greer, South Carolina. This label contained a UPS Ground tracking number.

114. A third label bore CATR's name, which is identified as "Shipper." This label stated the Fort Bragg Box had been packed on April 2, 2018 by "BMA". An additional label on the Fort Bragg Box bore a "Supplier Item Number", "CR-007703-02-000", and indicated a quantity of 250.

115. A fourth label bearing Fort Bragg's address and the same UPS tracking number that appeared on the second label (*see* ¶ 109, *supra*) is dated April 16, 2018.

116. A fifth label bore the phrase, "MADE IN U.S.A." in large print along with a prominent, stylized American flag symbol.

117. BMA is an acronym referring to the Bahamas Maritime Authority. The label bearing the "BMA" mark was applied at the Freeport Container Port ("FCP"), a port located in Freeport, a city on the island of Grand Bahama in the Bahamas.

118. A common business activity at FCP involves receiving large shipments of goods from countries such as China, repackaging the shipments' contents into a set of smaller boxes with new labels, and shipping these smaller boxes to locations within the United States.

119. The Fort Bragg Box bears telltale signs of this FCP repackaging process, most notably the BMA mark. Additionally, the label's reference to "1 of 40" indicates the Fort Bragg Box was merely one part of a shipment totaling 10,000 CATs.

120. The supplier item number "CR-007703-02-000" indicates the CATs contained in the Fort Bragg Box originated in China. The CR prefix to this number stands for "Customs Registration"; the Chinese government requires all imports and exports to and from China bear a Customs Registration code with the same CR prefix. These Customs Registration codes are a distinctive feature of the Chinese customs process.

121. Despite these clear indicia that the CATs originated in China and were shipped to Defendants' facility by way of the Bahamas, the Fort Bragg Box bore a label deceptively representing the CATs were "Made in U.S.A."

122. The Army personnel receiving and handling the Fort Bragg Box would not have been able to determine its "Made in U.S.A." label was a false

statement absent significant experience with international shipping and customs practices.

123. Plaintiff-Relators' agents identified another box containing CATs ("Lewis-McChord Box") in a storage room located at Joint Base Lewis-McChord, a joint Army and Air Force installation approximately nine miles outside of Tacoma, Washington.

124. Like the Fort Bragg Box, the Lewis-McChord Box bears a label containing NAR's logo and address as well as a second label bearing CATR's name associated with a Greer, South Carolina address. The latter label indicates the Lewis-McChord Box was packed on March 20, 2017 by "BMA", indicating it was repackaged in the Bahamas and then shipped to Defendants.

125. The Lewis-McChord Box also bears a label with the Chinese Customs Registration code "CR-007703-02-000", this time obscured by tape placed over the label. As with the Fort Bragg Box, the presence of this Chinese Customs Registration code demonstrates the contents of the Lewis-McChord Box originated in China.

126. Finally, the Lewis-McChord Box bears a label deceptively claiming its contents were "Made in U.S.A.", when in fact they were made in China and repackaged in the Bahamas before being shipped to Defendants' facility in Greer, South Carolina.

127. As with the Fort Bragg Box, the deceptive nature of the "Made in U.S.A." label on the Lewis-McChord Box is apparent only with significant knowledge of Chinese and Bahamian customs and shipping practices.

128. The Fort Bragg Box and Lewis-McChord Box are both typical of the boxes used by NAR and CATR to import goods from China into the United States and deceive DoD into accepting their Chinese-made goods as though they had genuinely been manufactured in the United States. From 2015 through the present, numerous other similarly-labeled boxes were used by NAR and CATR first, to import CATs from China and then, second, to fraudulently supply those Chinese-made CATs and medical kits containing Chinese-made CATs to DoD.

129. In a further effort to conceal the Chinese origin of the CATs Defendants sold to DoD, Defendants caused the CATs they sold to DoD to bear no country-of-origin markings either on the CATs themselves or on their immediate packaging. Pursuant to Section 304 of the Tariff Act of 1930, as amended, federal law requires these Chinese-made CATs to be marked in a way that clearly identifies them as being of Chinese origin. Defendants knowingly sold CATs that lack any country-of-origin markings to DoD as part of their scheme to evade the strictures of the Berry Amendment and TAA.

*d. Defendants Lack Sufficient Manufacturing Capacity to Produce Their Supposedly Berry Amendment and TAA-Compliant Goods in the United States*

130. Defendants claim they comply with the Berry Amendment and TAA when selling goods to DoD within the ambit of those laws.

131. On its publicly-accessible website, NAR states under the heading "TAA COMPLIANT", "[Y]ou can be assured that all NAR products supplied for GSA Schedules and other applicable government contracts are 100% TAA

compliant." A true and correct copy of the NAR web page bearing this statement is attached hereto as **Exhibit 13**.

132. On the same web page, under the heading "BERRY AMENDMENT COMPLIANT," NAR claims, "When contract requirements dictate compliance to these particular military specifications, the fabric component of our products consists of the highest quality, 100% U.S. made materials and is worthy of your trust when purchasing textile-related items."

133. Defendants cause the boxes they use to ship the goods they sell to DoD to prominently bear the label "Made in U.S.A.", despite their goods' actual origin in China. These "Made in U.S.A." labels denote the goods contained in the boxes so labeled are produced in the United States and therefore constitute representations that the contents of these boxes comply with the Berry Amendment and TAA.

134. Both NAR and CATR impliedly represent their compliance with the Berry Amendment and TAA by the very act of selling goods with textile components to DoD, most notably the CAT.

135. Defendants' claims of compliance with the Berry Amendment and TAA are not true.

136. Rather, Defendants obtain a large volume of the products they sell to DoD that contain material subject to the Berry Amendment from China. Defendants know these products have been manufactured in China.

137. Defendants are well aware the products they sell to DoD do not comply with the Berry Amendment and TAA. Defendants contracted to purchase

these products from Golden Season, which manufactures its goods in China. Some of the goods Defendants purchase from Golden Season pass through Golden Season's warehouse in Singapore, where no manufacturing activity occurs, while other goods are shipped directly to Defendants from China. Defendants' Chinese-made products then pass through the Bahamas and then on to their facilities in South Carolina, again with no additional manufacturing taking place outside China. And once received in South Carolina, Defendants perform no additional manufacturing on the goods they acquire from China.

138. Defendants' claims that they comply with the Berry Amendment and TAA are particularly far-fetched because they lack sufficient manufacturing capacity to make all their purportedly Berry Amendment-compliant products in the United States.

139. NAR's facility at 35 Tedwall Court, Greer, South Carolina performs no manufacturing activity. This facility serves as a delivery point for goods manufactured and sent to NAR by third-party suppliers, including its Chinese suppliers. NAR receives these goods at its Greer facility, sorts them and packages them into the various medical kits and sets NAR offers to DoD purchasers.

140. NAR owns a subsidiary, Two Rivers Medical, which maintains a second facility at 105 Parkins Mill Road, Greenville, South Carolina ("Two Rivers Facility"). The Two Rivers Facility employs imprisoned workers on work release as part of a vocational rehabilitation program. The Two Rivers Facility performs no manufacturing facility. Instead, workers at the Two Rivers Facility receives

goods from NAR's suppliers, including its Chinese suppliers, and repackages these goods into new boxes for shipment.

141. CATR and Composite maintain a 55,000 square foot manufacturing facility at 483 Lakeshore Parkway, Rock Hill, South Carolina ("Rock Hill Facility").

142. CATR occupies a portion of one floor of the Rock Hill Facility, about 12,000 square feet of space in total, where it represents to the public that it manufactures the CAT.

143. As depicted in publicly available video footage first aired in March 2020, CATR's portion of the Rock Hill Facility contains only basic equipment. Individual workers are depicted assembling CATs largely by hand.

144. Despite the lack of automated manufacturing equipment, as of March 2020, CATR represented publicly that it manufactures approximately 15,000 CAT tourniquets per day in its portion of the Rock Hill Facility. To meet this production rate, CATR would need to continuously produce approximately 10.5 CATs per minute.

145. CATR's manufacturing facilities are not sufficient to produce CATs at the pace Defendants claim, particularly given its lack of automated manufacturing equipment.

146. Defendants have no other manufacturing facilities in the United States. Instead, to meet DoD's remaining demand for CAT tourniquets, Defendants source a large number of CATs from China that are manufactured in China and contain materials produced in China. Defendants have gone to

great lengths to disguise the Chinese origin of these tourniquets using their convoluted shipping and repackaging scheme to deceive the Government into accepting these Chinese-made tourniquets notwithstanding their knowing that the products do not comply with the Berry Amendment and TAA.

## IV. NAR Deceptively Sells Multiple "Sterile" Products to DoD in Packaging That is Impossible to Sterilize

147. NAR markets several products, including Compressed Gauze, ETD, and ARS Needles (see ¶¶ 17-19, *supra*) as "sterile". Each of these products are routinely sold to DoD both separately and in medical kits, including the medical kits discussed in ¶¶ 33-44, *supra*.

148. Each of these products are intended to be placed in direct contact with an injured soldier's wounds or to be inserted directly into an injured soldier's body. It is therefore of paramount importance that they be kept sterile to minimize the risk of a serious infection.

149. Standard industry practice provides the packaging of sterilized medical devices must bear a label reading "STERILE" alongside a code specifying the manner in which each item was sterilized. NAR follows this standard industry practice with respect to the Compressed Gauze, ETD and ARS Needles they sell to DoD.

150. As relevant here, a sterilization code of "EO" refers to sterilization by exposure to ethylene oxide gas. Sterilizing medical devices in this manner involves placing the devices in a sealed chamber, which is then filled with ethylene oxide gas and pressurized. The high pressure in the gas chamber forces

the ethylene oxide gas into the devices' packaging and sterilizes the surfaces it contacts.

151. For ethylene oxide sterilization to be effective, it is crucial that the devices to be sterilized are packaged in gas-permeable packaging so that the ethylene oxide gas can come into direct contact with the devices' surface. Devices that are packaged in vacuum-sealed or otherwise non-permeable containers cannot be sterilized using ethylene oxide.

152. Between 2015 and the present, NAR has sold substantial volumes of Compressed Gauze, ETDs and ARS Needles marked "STERILE" alongside the code "EO", representing these products were sterilized with ethylene oxide. These products were sold to DoD both as individual units and as part of medical kits. Compressed Gauze, ETD and/or ARS Needles were included in each of the medical kits described in ¶¶ 33-44, *supra*, and the accompanying exhibits.

153. Plaintiff-Relators and their agents have personally observed Compressed Gauze, ETDs and ARS Needles in storage within DoD facilities packaged in vacuum-sealed or otherwise non-permeable containers and bearing the false and deceptive "STERILE" and "EO" labels NAR placed upon them.

154. It is not possible that the Compressed Gauze and ETDs that NAR sold to DoD were sterilized with ethylene oxide. NAR's Compressed Gauze and ETD are packaged in vacuum-sealed containers. A vacuum-sealed container by its nature prevents all gases, including ethylene oxide, from entering the container. Ethylene oxide is only effective as a sterilization agent if it comes in contact with the surfaces intended to be sterilized. As such, any attempt to

sterilize Compressed Gauze or ETD packaged in vacuum-sealed containers would fail because such containers would prevent the ethylene oxide gas from coming into contact with the Compressed Gauze or ETD.

155. It is likewise not possible that the ARS Needles NAR sold to DoD were sterilized with ethylene oxide. The ARS Needles are packaged in sealed, non-permeable plastic containers. By design, these containers prevent all gases, including ethylene oxide, from coming into contact with their contents. As with the Compressed Gauze and ETDs, any attempt to sterilize the ARS Needles contained in the sealed and non-permeable containers NAR packages them in would fail; such containers would prevent the ethylene oxide gas from coming into contact with the ARS Needles.

156. The "STERILE" and "EO" labels NAR placed on the packaging of the Compressed Gauze, ETDs and ARS Needles it sold to DoD constitute false representations by NAR to DoD that these products were in fact sterilized with ethylene oxide.

157. Medical devices such as Compressed Gauze, ETDs and ARS Needles that are intended to come in direct contact with the interior of a person's body must be sterilized to avoid serious and potentially fatal infections when those devices are used.

158. Under Section 502(a) of the Federal Food, Drug and Cosmetic Act ("FFDCA"), codified as amended at 21 U.S.C. § 352(a), a medical device is "misbranded" if, *inter alia*, "its labeling is false or misleading in any particular."

Misbranded devices are liable for seizure, condemnation and destruction by the United States Food and Drug Administration ("FDA"). *See* 21 U.S.C. § 334(a).

159. DoD is absolutely unwilling to purchase misbranded medical devices. This is especially true because FDA and DLA have entered into a memorandum of understanding ("MOU") under which DLA has delegated most "quality assurance support" functions for medical products it purchases and uses to FDA. *See* FDA, *MOU 225-15-016 Replaces 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* (Dec. 18, 2017), https://www.fda.gov/about-fda/domestic-mous/mou-225-15-016-replaces-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. The FFDCA also specifically prohibits the receipt of misbranded medical devices. *See* 21 U.S.C. § 331(c).

160. The MOU requires DLA to include "a provision requiring compliance with [FFDCA] and implementing regulations promulgated thereunder" in all contracts for medical products. NAR's sale of misbranded and deceptively labeled Compressed Gauze, ETDs and ARS Needles to DoD violated FFDCA, which prohibits the "introduction . . . into interstate commerce" of misbranded medical devices. *See* 21 U.S.C. § 331(a).

## COUNT ONE
## Violation of 31 U.S.C. § 3729(a)(1)(A)
## (Unlawful Substitution of the CAT Gen 7 for the CAT Gen 6)
## (Against All Defendants)

161. All the preceding allegations are incorporated herein by reference.

162. Beginning no later than November 6, 2015, Defendants NAR and CATR, by and through their officers, employees and agents, knowingly presented

false claims for payment to the Government and caused false claims for payment to be presented to the Government, all in violation of 31 U.S.C. § 3729(a)(1)(A).

163. These claims for payment were false and knowingly false. Defendants at all relevant times knew the Government ordered and intended to purchase the CAT Gen 6 and medical kits containing the CAT Gen 6. Rather than providing the Government with the goods it wanted, Defendants substituted the untested and inferior CAT Gen 7 for the CAT Gen 6 when fulfilling the Government's orders for the CAT Gen 6 and medical kits containing the CAT Gen 6. When Defendants then submitted claims for payment to the Government based on the orders they fulfilled, they did not inform the Government that they had fulfilled the Government's orders using inferior substitute products. Instead, by using the same NSN for both the CAT Gen 6 and CAT Gen 7, Defendants knowingly misrepresented the inferior CAT Gen 7 as being *precisely the same product* as the CAT Gen 6 the Government ordered when in fact they knew of the material differences between the CAT Gen 6 and CAT Gen 7. Defendants' deception in this regard was so successful that DoD did not become aware they had received any CAT Gen 7s until months after the first substitutions occurred.

164. From November 6, 2015 through the present, Defendant NAR received orders directly from units within DoD, through ECAT and other contracting channels, to purchase the CAT Gen 6 and medical kits containing the CAT Gen 6. All of these DoD orders specified the Government intended to purchase the CAT Gen 6 by using the unique NSN assigned to the CAT Gen 6, 6515-01-521-7976.

165. During the same period, Defendant NAR received orders from prime vendors to purchase the CAT Gen 6 and medical kits containing the CAT Gen 6. As with the orders NAR received directly from the Government, these prime vendor orders specified they intended to purchase the CAT Gen 6 by using the unique NSN assigned to the CAT Gen 6, 6515-01-521-7976.

166. Defendant NAR at all times knew that the orders it received from prime vendors for the CAT Gen 6 and medical kits containing the CAT Gen 6 were made so that the prime vendors could supply the products they ordered to DoD through PVP, and that the prime vendors would make claims to the Government for payment in exchange for the CAT Gen 6 tourniquets and medical kits containing the CAT Gen 6 they supplied to DoD.

167. Defendant NAR knowingly and intentionally filled these orders it received from the Government directly and from prime vendors not with the CAT Gen 6, as the Government requested and expected, but with the CAT Gen 7.

168. Defendants at all times knew the CAT Gen 7 varied materially from the CAT Gen 6. The CAT Gen 7 cannot successfully be operated in the same manner as the CAT Gen 6. And the CAT Gen 7 is prone to usage problems and failures that did not plague the CAT Gen 6.

169. Defendants fraudulently represented the CAT Gen 7 was the same product as the CAT Gen 6 the Government ordered. Defendants used the NSN 6515-01-521-7976, which is the Government's unique identifier for the CAT Gen 6, when referring to the CAT Gen 7 in connection with sales of the CAT Gen 7 to the Government.

170. In doing so, Defendants represented to the Government that the CAT Gen 7 was precisely the same item as the CAT Gen 6, despite at all times knowing the CAT Gen 7 was a distinct product with a substantially changed design that could not be successfully operated in the same manner as the CAT Gen 6.

171. Defendants misleadingly hold out the CAT Gen 7 as being fully tested and safe when in fact Defendants intentionally evaded subjecting the CAT Gen 7 to the Phase I and Phase II JOEFT tests and the CAT Gen 7 has in fact proven to be deeply flawed and unsafe for use. DoD personnel who are issued the CAT Gen 7 have been forced to improvise methods to compensate for the CAT Gen 7's serious shortcomings, including by securing the CAT Gen 7 with tape and by applying multiple tourniquets to a single wounded limb in an effort to ensure at least one CAT Gen 7 will work properly.

172. Defendants did not inform the DoD units ordering the CAT Gen 6 and medical kits containing the CAT Gen 6, both directly and through prime vendors, that Defendants were not supplying the CAT Gen 6 tourniquets the DoD units had ordered but that Defendants had instead substituted the CAT Gen 7 for the tourniquets those units actually ordered.

173. DoD and the DoD units ordering CAT Gen 6 tourniquets and medical kits containing the CAT Gen 6 did not know—and because of Defendants' fraud, false statements and fraudulent claims could not reasonably have known—Defendants instead were supplying the Government (both directly and through third party prime contractors and distributors), including those DoD units, with

undisclosed, untested and inferior CAT Gen 7 tourniquets and medical kits containing CAT Gen 7s.

174. Defendant NAR presented claims to the Government for payment on account of the orders it filled by fraudulently substituting the CAT Gen 7 tourniquets for the CAT Gen 6 tourniquets (and medical kits containing CAT Gen 7 tourniquets for medical kits that were supposed to contain CAT Gen 6 tourniquets), knowing all the while both that this substitution occurred and knowing its representation to the Government that it was supplying tourniquets identical to the CAT Gen 6 tourniquet was false.

175. Defendant NAR also presented claims to prime vendors for payment on account of the orders it filled by fraudulently substituting the CAT Gen 7 for the CAT Gen 6, knowing all the while both that this substitution occurred and knowing its representation to the Government that the CAT Gen 7 is identical to the CAT Gen 6 was false. Defendant NAR knew that these prime vendors would in turn present claims to the Government for payment in connection with the CAT Gen 7s NAR supplied to the prime vendors, and that those claims by the prime vendors to the Government would contain the very same fraudulent misrepresentations that NAR had made to the prime vendors themselves.

176. With respect to all of these transactions, Defendant CATR caused and participated in NAR's fraudulent misrepresentations to the Government and to the prime vendors by supplying CAT Gen 7s to NAR in place of the CAT Gen 6. Defendant CATR at all times knew and intended these CAT Gen 7s would be used to replace CAT Gen 6s in orders made directly by the Government and also

by prime vendors who in turn would supply those tourniquets to the Government. Defendant CATR labeled the CAT Gen 7s it supplied to NAR with the same NSN it had previously labeled the CAT Gen 6 with, despite knowing the CAT Gen 7 was not identical to the CAT Gen 6 and was in fact an entirely different product.

177. To date, the Government has paid Defendants at least $400 million in exchange for the fraudulently substituted CAT Gen 7s and medical kits containing the CAT Gen 7. These payments were caused by Defendants' fraud, false statements and fraudulent claims.

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America, request the Court enter judgment against Defendants for three times the amount of damages proven at trial and a civil penalty of between $11,665 and $23,331 for each false claim and false statement or record as provided by 31 U.S.C. § 3729(a)(1) (as adjusted in 28 C.F.R. § 85.5 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 28 U.S.C. § 2461 note).

**COUNT TWO**
**Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(False Certification of Compliance with Berry Amendment and TAA)**
**(Against All Defendants)**

178. All the preceding allegations are incorporated herein by reference.

179. Defendants knowingly made false statements and submitted false records to the Government by knowingly and falsely representing their products, including the CAT, Compressed Gauze, ETD and Spider Straps, complied with the Berry Amendment and TAA.

180. Defendants' false statements and false records in this regard were made in connection with Defendants' claims for payment made to the Government for Defendants' sales of these products directly to DoD through ECAT and other contracting channels.

181. Defendants' false statements and false records in this regard were also made in connection with claims for payment made by prime vendors to the Government for those prime vendors' sales of Defendants' products to DoD through PVP. Defendants knowingly and falsely represented to these prime vendors their products complied with the Berry Amendment and TAA, knowing the prime vendors would make parallel representations to the Government in connection with the prime vendors' claims for payment and in reliance on Defendants' representations in this regard.

182. The Berry Amendment applies to the CAT, Compressed Gauze, ETD and Spider Straps when those products are sold to DoD because each of these products contain fabric or textile components. *See* DFARS § 225.7002-1(a)(1)(iv)-(ix). Substantially all of the material comprising Compressed Gauze, ETD and Spider Straps are covered by the Berry Amendment. The CAT contains some components that are not fabric or textiles, but the operative components of the CAT (i.e. the band that is placed around an injured limb and tightened to restrict blood flow) are made of fabric.

183. TAA applies to all Government procurements in excess of $193,000 such as the procurements at issue in this case, and therefore applies to

Defendants' sale of the CAT, Compressed Gauze, ETD and Spider Straps to the Government both directly and through prime vendors.

184. Defendants NAR and CATR each knew at all times the CAT, Compressed Gauze, ETD and Spider Straps did not comply with the Berry Amendment. Both Defendants were integrally involved in the supply chain from these products' manufacturers to the Government. Defendants were at all times aware these products were not manufactured in the United States and were in fact manufactured in foreign countries including China using material produced in China.

185. Defendants also knew the CAT, Compressed Gauze, ETD and Spider Straps did not comply with the TAA because, as they were at all times aware, those products were manufactured in China.

186. Defendants orchestrated a complex scheme to conceal the true origins of their products and deceive the Government into believing their products were of American make.

187. In furtherance of that scheme, Defendants purchased their Chinese-made goods through suppliers located in Taiwan and Singapore. Rather than receive these products directly from East Asian ports, Defendants caused their Taiwanese and Singaporean suppliers to deliver their products to the Bahamas, where they were repackaged and sent to Defendants' facilities. Defendants then forwarded or repackaged these products again in several facilities they own or operate located in South Carolina before shipping the products to DoD facilities from South Carolina.

188. Defendants caused boxes containing their products and shipped to DoD facilities to be labeled "Made in U.S.A.", despite at all times knowing these products were not made in the United States and were instead made in China using Chinese content.

189. In a further effort to conceal the Chinese origin of their products, Defendants knowingly and intentionally omitted any country-of-origin markings from the CATs they sold to DoD, in violation of Section 304 of the Tariff Act of 1930. Such markings would have revealed to DoD these CATs were in fact produced in China and therefore also revealed the Defendants' fraudulent scheme to sell Chinese-made goods to DoD in violation of the Berry Amendment and TAA.

190. Defendants' false statements certifying compliance with the Berry Amendment and TAA and deceptively concealing the Chinese origin of their products were material to the Government's decision to pay Defendants' monetary claims in exchange for the CATs, Compressed Gauze, ETD and Spider Straps DoD purchased from Defendants. DoD routinely refuses to accept delivery of goods when it is aware they do not comply with the Berry Amendment or TAA, even when the non-compliance is limited to small components of the items in question, and likewise consistently refuses to permit DoD units to purchase or pay for goods that do not comply with the Berry Amendment or TAA. As Defendants at all times knew, the Government would only agree to pay Defendants in exchange for their non-compliant goods if Defendants succeeded in deceiving the Government as to the origin of those goods.

191. To date, the Government has paid Defendants approximately $400 million in exchange for Defendants' goods, including the CAT Gen 6 and CAT Gen 7 (and medical kits containing the CAT Gen 6 and/or CAT Gen 7), Compressed Gauze, ETDs, ARS Needles and Spider Straps, that Defendants fraudulently misrepresented were produced in the United States when in fact they were produced in China. These payments were caused by Defendants' fraud, false statements and fraudulent claims.

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America, request the Court enter judgment against Defendants for three times the amount of damages proven at trial and a civil penalty of between $11,665 and $23,331 for each false claim and false statement or record as provided by 31 U.S.C. § 3729(a)(1) (as adjusted in 28 C.F.R. § 85.5 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 28 U.S.C. § 2461 note).

**COUNT THREE**
**Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(False Statements That NAR Products Were "Sterile")**
**(Against Defendant NAR)**

192. All the preceding allegations are incorporated herein by reference.

193. NAR knowingly made false statements and submitted false records to the Government by knowingly and falsely representing their products, including Compressed Gauze, ETDs and ARS Needles, were "STERILE" and were sterilized with ethylene oxide when it was in fact impossible for those products to be sterilized in the manner NAR represented.

194. NAR's false statements and false records in this regard were made in connection with NAR's claims for payment made to the Government for NAR's sales of these products directly to DoD through ECAT and other contracting channels.

195. NAR's false statements and false records in this regard were also made in connection with claims for payment made by prime vendors to the Government for those prime vendors' sales of NAR's products to DoD through PVP. NAR knowingly and falsely represented to these prime vendors their products were "STERILE" and had been sterilized with ethylene oxide, knowing the prime vendors would make parallel representations to the Government in connection with the prime vendors' claims for payment and in reliance on NAR's representations in this regard.

196. NAR knowingly and intentionally caused the packaging of the Compressed Gauze, ETDs and ARS Needles it sold to DoD to bear labels reading "STERILE" alongside the code "EO". As NAR at all relevant times knew, the code "EO" alongside the word "STERILE" on a product label represents that the product so labeled has been sterilized by exposure to ethylene oxide.

197. NAR's Compressed Gauze and ETDs are both packaged in vacuum-sealed containers. It is impossible to sterilize any item whatsoever, including Compressed Gauze and ETDs, using ethylene oxide when such item is packaged in a vacuum-sealed container. Vacuum-sealed containers prevent their contents from being exposed to any gas, and exposure to ethylene oxide gas is a critical step in ethylene oxide sterilization.

198. NAR's ARS Needles are packaged in sealed, non-permeable plastic containers. It is impossible to sterilize any item whatsoever, including ARS Needles, using ethylene oxide when such item is packaged in a sealed, non-permeable plastic container. Sealed and non-permeable plastic containers prevent their contents from being exposed to any gas not already present in the container at the time it is sealed, and exposure to ethylene oxide gas is a critical step in ethylene oxide sterilization. No ethylene oxide gas is present in the ARS Needles at the time they are sealed.

199. As NAR at all relevant times knew, NAR's representation that the Compressed Gauze, ETDs and ARS Needles it sold to DoD had been sterilized using ethylene oxide was false. NAR at all relevant times knew it is not possible to use ethylene oxide gas to sterilize devices, including Compressed Gauze, ETDs and ARS Needles, when those devices are packaged in vacuum-sealed containers or sealed, non-permeable plastic containers.

200. NAR knowingly and falsely stated on the packaging of the Compressed Gauze, ETDs and ARS Needles it sold to DoD that those items were "STERILE" and sterilized by ethylene oxide to ensure it would continue to be paid by the Government in exchange for those products and medical kits containing those products.

201. NAR's false statements representing the Compressed Gauze, ETDs and ARS Needles it sold to DoD were "STERILE" and sterilized by ethylene oxide were material to the Government's decision to pay NAR's claims in connection with these sales. It is readily apparent to all personnel trained to use gauze,

bandages and decompression needles (such as Compressed Gauze, ETDs and ARS Needles, respectively) that these devices must be kept sterile to avoid serious infections. As NAR at all relevant times knew, the Government would not accept Compressed Gauze, ETDs and ARS Needles and would not pay NAR's claims for providing these items if NAR did not represent that they were sterile. NAR falsely stated these products were "STERILE" and were sterilized with ethylene oxide to convince the Government to pay its claims for selling Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices, to DoD.

202. To date, the Government has paid Defendants approximately $400 million in exchange for NAR's goods, including Compressed Gauze, ETDs and ARS Needles (and medical kits containing Compressed Gauze, ETDs and ARS Needles), that NAR fraudulently misrepresented were "STERILE" and sterilized by ethylene oxide. These payments were caused by NAR's fraud, false statements and fraudulent claims.

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America, request the Court enter judgment against Defendants for three times the amount of damages proven at trial and a civil penalty of between $11,665 and $23,331 for each false claim and false statement or record as provided by 31 U.S.C. § 3729(a)(1) (as adjusted in 28 C.F.R. § 85.5 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 28 U.S.C. § 2461 note).

**COUNT FOUR**
**Violation of 31 U.S.C. § 3729(a)(1)(B)**
**(Implied False Certification That NAR Products Were "Sterile")**
**(Against Defendant NAR)**

203. All the preceding allegations are incorporated herein by reference.

204. NAR knowingly made false statements and submitted false records to the Government by knowingly and falsely representing their products, including Compressed Gauze, ETDs and ARS Needles, were "STERILE" and were sterilized with ethylene oxide when it was in fact impossible for those products to be sterilized in the manner NAR represented.

205. NAR's false statements and false records in this regard were made in connection with NAR's claims for payment made to the Government for NAR's sales of these products directly to DoD through ECAT and other contracting channels.

206. NAR's false statements and false records in this regard were also made in connection with claims for payment made by prime vendors to the Government for those prime vendors' sales of NAR's products to DoD through PVP. NAR knowingly and falsely represented to these prime vendors their products were "STERILE" and had been sterilized with ethylene oxide, knowing the prime vendors would make parallel representations to the Government in connection with the prime vendors' claims for payment and in reliance on NAR's representations in this regard.

207. NAR knowingly and intentionally caused the packaging of the Compressed Gauze, ETDs and ARS Needles it sold to DoD to bear labels reading

"STERILE" alongside the code "EO". As NAR at all relevant times knew, the code "EO" alongside the word "STERILE" on a product label represents that the product so labeled has been sterilized by exposure to ethylene oxide.

208. NAR's Compressed Gauze and ETDs are both packaged in vacuum-sealed containers. It is impossible to sterilize any item whatsoever, including Compressed Gauze and ETDs, using ethylene oxide when such item is packaged in a vacuum-sealed container. Vacuum-sealed containers prevent their contents from being exposed to any gas, and exposure to ethylene oxide gas is a critical step in ethylene oxide sterilization.

209. NAR's ARS Needles are packaged in sealed, non-permeable plastic containers. It is impossible to sterilize any item whatsoever, including ARS Needles, using ethylene oxide when such item is packaged in a sealed, non-permeable plastic container. Sealed and non-permeable plastic containers prevent their contents from being exposed to any gas not already present in the container at the time it is sealed, and exposure to ethylene oxide gas is a critical step in ethylene oxide sterilization. No ethylene oxide gas is present in the ARS Needles at the time they are sealed.

210. As NAR at all relevant times knew, NAR's representation that the Compressed Gauze, ETDs and ARS Needles it sold to DoD had been sterilized using ethylene oxide was false. NAR at all relevant times knew it is not possible to use ethylene oxide gas to sterilize devices, including Compressed Gauze, ETDs and ARS Needles, when those devices are packaged in vacuum-sealed containers or sealed, non-permeable plastic containers.

211. Compressed Gauze, ETDs and ARS Needles are each a "device" within the meaning of the FFDCA and are therefore subject to the strictures of the FFDCA. *See* 21 U.S.C. § 321(h)(1). Compressed Gauze is explicitly intended both by NAR and by the Government to be used to treat bleeding and to dress and bandage wounds. ETDs are explicitly intended both by NAR and by the Government to be used, *inter alia*, to dress and bandage wounds, to sling and swathe injured extremities and to secure splints to injured extremities. ARS Needles are explicitly intended both by NAR and by the Government to be inserted directly into a patient's body to treat certain types of collapsed lung injuries.

212. Pursuant to the MOU between FDA and DLA, all DoD contracts for the purchase of "devices" within the meaning of FFDCA are required to include provisions mandating the contractor comply with FFDCA. Pursuant to the MOU, all the contracts for the sale of Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices, to DoD contained a provision requiring NAR to comply with FFDCA in providing these items to DoD.

213. The FFDCA prohibits "[t]he introduction or delivery for introduction into interstate commerce of any ... device ... that is ... misbranded." 21 U.S.C. § 331(a). Under the FFDCA, a device is "misbranded" if, *inter alia,* "its labeling is false or misleading in any particular." 21 U.S.C. § 352(a). Misbranded devices delivered or received in violation of FFDCA are liable to be seized and condemned by FDA. 21 U.S.C. § 334(a)(1).

214. The Compressed Gauze, ETDs and ARS Needles NAR sold to DoD are "misbranded" within the meaning of the FFDCA. These products' labels falsely and misleadingly represent they are "STERILE" and sterilized using ethylene oxide when in fact they are not.

215. NAR violated FFDCA by selling Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices, to DoD. These sales were each an "introduction . . . into interstate commerce" of misbranded devices within the meaning of FFDCA.

216. By selling Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices, to DoD, NAR impliedly represented to DoD that it complied with FFDCA in connection with its sales of these products. As NAR at all relevant times knew, compliance with FFDCA was required by all the contracts it made with DoD for the sale of Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices. NAR also knew at all relevant times that compliance with FFDCA was required by all the contracts between DoD and the prime vendors and other third-party distributors to whom NAR sold Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices, knowing and intending that these third-party distributors would in turn sell NAR's products to DoD.

217. As NAR at all relevant times knew, NAR's implied representation to the Government that it complied with FFDCA in connection with all its sales of Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices to DoD was false and fraudulent. As NAR knew, all of its sales of these

products to DoD each constituted a violation of FFDCA because each sale was an "introduction . . . into interstate commerce" of NAR's misbranded devices.

218. NAR's false statements certifying its compliance with FFDCA were material to the Government's decision to pay NAR's monetary claims in exchange for the Compressed Gauze, ETDs and ARS Needles, and medical kits containing these devices DoD purchased from NAR. DoD is well aware that misbranded devices are susceptible to seizure and condemnation by FDA. In accordance with the MOU, DLA regularly coordinates with FDA and calls upon the FDA for assistance in ensuring that DoD does not purchase any devices unless both the devices and the vendors providing those devices fully comply with FFDCA and the regulations promulgated thereunder. As NAR at all times knew, the Government would only agree to pay NAR in exchange for its goods if NAR fraudulently represented it fully complied with FFDCA in connection with its sale of Compressed Gauze, ETDs and ARS Needles to DoD.

219. To date, the Government has paid Defendants approximately $400 million in exchange for NAR's goods, including Compressed Gauze, ETDs and ARS Needles (and medical kits containing Compressed Gauze, ETDs and ARS Needles), that NAR fraudulently misrepresented were "STERILE" and sterilized by ethylene oxide in compliance with FFDCA. These payments were caused by NAR's fraud, false statements and fraudulent claims.

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America, request the Court enter judgment against Defendants for three times the amount of damages proven at trial and a civil penalty of between $11,665 and $23,331

for each false claim and false statement or record as provided by 31 U.S.C. § 3729(a)(1) (as adjusted in 28 C.F.R. § 85.5 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 28 U.S.C. § 2461 note).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relators, on behalf of the United States of America, request the Court:

1. enter judgment against Defendants for three times the amount of damages proven at trial and a civil penalty of between $11,665 and $23,331 for each false claim and false statement or record as provided by 31 U.S.C. § 3729(a)(1) (as adjusted in 28 C.F.R. § 85.5 pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 28 U.S.C. § 2461 note);

2. award Plaintiff-Relators a reasonable proportion of the proceeds of this action as contemplated by 31 U.S.C. § 3730(d);

3. pursuant to 31 U.S.C. § 3730(d), award Plaintiff-Relators their reasonable expenses necessarily incurred in bringing this action plus their reasonable attorneys' fees and costs;

4. award Plaintiff-Relators and the United States of America pre-judgment interest on all amounts awarded; and

5. all other relief as the Court deems just and proper.

VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Corey Russ
Corey Russ

/s/ Christopher Murphy
Christopher Murphy

Dated: September 24, 2021

Respectfully submitted,

Michael J McDonnell III

Michael T. McDonnell III (PA Bar No. 60111)
KUTAK ROCK LLP
1760 Market Street
Suite 1100
Philadelphia, Pennsylvania 19103-4104
Phone: (215) 299-4384
Facsimile: (215) 981-0719
michael.mcdonnell@kutakrock.com
*Counsel of Record for Plaintiff -Relators Corey Russ and Christopher Murphy*

**INDEX OF DEFINED TERMS**

| DEFINED TERM | DEFINITION | 1ST APPEARANCE (¶) |
|---|---|---|
| **Air Force** | United States Air Force | 77 |
| **ALARACT** | All Army Activities message | 47 |
| **Army** | United States Army | 46 |
| **ARS Needle** | ARS Decompression Needle | 20 |
| **Berry Amendment** | 10 U.S.C. § 2533a | 93 |
| **BidLink** | BidLink Software Systems | 34 n.4 |
| **BMA** | Bahamas Maritime Authority | 117 |
| **CAT** | Combat Application Tourniquet | 13 |
| **CAT Gen 3** | Third-generation CAT | 47 |
| **CAT Gen 6** | Sixth-generation CAT | 49 |
| **CAT Gen 7** | Sixth-generation CAT | 56 |
| **CATR** | Defendant C-A-T Resources, LLC | 1 |
| **CBP** | U.S. Customs and Border Patrol | 100 |
| **China** | People's Republic of China | 17 |
| **China Surgical Dressings** | China Surgical Dressings Center Co. | 101 |

| | | |
|---|---|---|
| **CLS** | Combat Life Saver kit | 39 |
| **Combat Medical** | Combat Medical Systems, LLC | 2 |
| **Composite** | Composite Resources, Inc. | 14 |
| **Compressed Gauze** | Compressed Gauze and Wound Packing Gauze | 18 |
| **CoTCCC** | Committee on Tactical Combat Casualty Care | 55 |
| **CR** | Customs Registration | 120 |
| **customer** | Military units/agencies acquiring medical devices from DLA Troop Support | 28 |
| **DAPA** | Distribution and Pricing Agreement | 28 |
| **DFARS** | Defense Federal Acquisition Regulation Supplement | 95 |
| **DLA** | Defense Logistics Agency | 26 |
| **DLA Troop Support** | Subordinate unit of DLA | 26 |
| **DLA Troop Support HQ** | Headquarters of DLA Troop Support located at 700 Robbins Avenue, Philadelphia, Pennsylvania 19111 | 7 |
| **DoD** | United States Department of Defense | 1 |

| | | |
|---|---|---|
| **DoD IG** | DoD Office of the Inspector General | 99 |
| **ECAT** | Electronic Catalog | 24 |
| **EO** | Ethylene oxide sterilization | 150 |
| **ETD** | Emergency Trauma Dressing | 19 |
| **EverReady** | SZY Holdings, LLC d/b/a EverReady First Aid | 42 n.8 |
| **FAR** | Federal Acquisition Regulation | 96 |
| **FBI** | Federal Bureau of Investigation | 8 n.1 |
| **FCP** | Freeport Container Port, a container port in Freeport, Grand Bahama, Bahamas | 117 |
| **FDA** | United States Food and Drug Administration | 158 |
| **FFDCA** | Federal Food, Drug and Cosmetic Act | 158 |
| **FLIS** | Federal Logistics Information System | 71 |
| **Fort Bragg Box** | Box filled with CATs observed by Plaintiff-Relators at Fort Bragg | 111 |
| **Gallagher** | Timothy Gallagher, Managing Director of Kroll | 8 |

| | | |
|---|---|---|
| **GFAK** | General First Aid Kit | 43 |
| **Golden Season** | Golden Season PTE, Ltd. | 102 |
| **Government** | Government of the United States | 1 |
| **IFAK** | Individual First Aid Kit | 47 |
| **IFAK II** | Individual First Aid Kit II | 41 |
| **IFAK II Refill** | Individual First Aid Kit Generation II Refill | 36 |
| **IFAK Refill** | Individual First Aid Kit Refill | 35 |
| **JOEFT** | Joint Operational Evaluation of Field Tourniquets | 48 |
| **Kroll** | Kroll, Inc. | 8 |
| **Lewis-McChord Box** | Box containing CATs observed by Plaintiff-Relators at Joint Base Lewis-McChord | 123 |
| **MAK** | Maritime Assault Kit | 37 |
| **Marine Corps** | United States Marine Corps | 78 |
| **medical kit** | Collection of medial devices and supplies intended for field use | 25 n.3 |
| **MMQC** | Medical Materiel Quality Control Message | 80 |

| | | |
|---|---|---|
| **MOU** | Memorandum of Understanding between FDA and DLA | 159 |
| **MultiCam** | Camouflage pattern developed and used by the Army | 38 n.5 |
| **Murphy** | Plaintiff-Relator Christopher Murphy | 1 |
| **NAR** | Defendant North American Rescue, LLC | 1 |
| **NASA** | National Aeronautics and Space Administration | 8 n.1 |
| **NSN** | National Stock Number | 50 |
| **prime vendor** | Contractor under PVP | 28 |
| **PVP** | Prime Vendor Program | 27 |
| **Rock Hill Facility** | Facility maintained by CATR and Composite at 483 Lakeshore Parkway, Rock Hill, South Carolina | 141 |
| **Russ** | Plaintiff-Relator Corey Russ | 1 |
| **SEKRI** | Southeastern Kentucky Rehabilitation Industries, Inc. | 35 |
| **SOFTT** | Special Operations Forces Tactical Tourniquet | 47 |
| **Spider Straps** | Casualty Immobilization System | 21 |

| | | |
|---|---|---|
| **TAA** | Trade Agreements Act of 1979, 19 U.S.C. § 2511 *et seq.* | 17 |
| **TRC** | The Resource Center | 43 |
| **Two Rivers Facility** | Facility maintained by Two Rivers Medical at 105 Parkins Mill Road, Greenville, South Carolina | 140 |
| **Two Rivers Medical** | TQM, LLC, a subsidiary of NAR | 40 n.6 |
| **UFAK** | Universal First Aid Kit | 40 |
| **USAMMA** | U.S. Army Medical Materiel Agency | 76 |
| **USCG IFAK** | U.S. Coast Guard pattern Individual First Aid Kit | 42 |
| **WALK** | Warrior Aid and Litter Kit | 38 |

## SUMMARY OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | 1ST APPEARANCE (¶) |
|---|---|---|
| **1** | Report detailing Government purchases of stand-alone CAT, 2015-2021 | 34 |
| **2** | Report detailing Government purchases of IFAK Refill, 2015-2021 | 35 |
| **3** | Report detailing Government purchases of IFAK II Refill, 2015-2021 | 36 |
| **4** | Report detailing Government purchases of MAK, 2015-2021 | 37 |
| **5** | Report detailing Government purchases of WALK in MultiCam Pattern, 2015-2021 | 38 |
| **6** | Report detailing Government purchases of WALK in Coyote Brown color, 2015-2021 | 38 |
| **7** | Report detailing Government purchases of CLS, 2015-2021 | 39 |
| **8** | Report detailing Government purchases of UFAK, 2015-2021 | 40 |
| **9** | Report detailing Government purchases of IFAK II, 2015-2021 | 41 |
| **10** | Report detailing Government purchases of USCG IFAK in Coyote Brown color, 2015-2021 | 42 |
| **11** | Report detailing Government purchases of USCG IFAK in Black color, 2015-2021 | 42 |
| **12** | Report detailing Government purchases of GFAK, 2015-2021 | 43 |
| **13** | NAR web page stating NAR's products comply with TAA and Berry Amendment | 131 |