**In the United States District Court**
**For the Eastern District of Pennsylvania**

| | | |
|---|---|---|
| UNITED STATES *ex. rel.* RUSS & MURPHY | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 21-CV-4238 |
| | : | |
| NORTH AMERICAN RESCUE, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

**C-A-T RESOURCES, LLC'S BRIEF IN SUPPORT OF**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

   I.   *CRI v. Combat Medical* ........................................................................................ 2

   II.  *Combat Medical v. Esper* .................................................................................... 3

   III.  The Instant Qui Tam Action .................................................................................. 5

   IV.  CAT Resources highlights Relators' and their counsel's omission of known key facts and demonstrates the falsity of the FAC's central allegations and the applicability of the public disclosure bar. ......................................................................................... 6

   V.   Relators delay six weeks before dropping Count 1 and re-alleging Count 2 "on information and belief." ......................................................................................... 8

STANDARD OF DECISION ............................................................................................... 9

ARGUMENT ...................................................................................................................... 11

   I.   Deleting the FAC's false Chinese "Customs Registration" and "Bahamas Maritime Authority" allegations does not salvage Relators' "complex repackaging scheme" allegations in the SAC. ......................................................................................... 12

   II.  Substituting the FAC's reference to publicly available video footage with "on information and belief" does not salvage Count 2 (renumbered Count 1). ..................... 16

   III.  Relators have not and cannot sufficiently plead their qualification as original sources... 19

CONCLUSION .................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................9

*U.S. ex rel. Bartlett v. Tyrone Hosp., Inc.*,
    234 F.R.D. 113 (W.D. Pa. 2006) ...................................................................................19

*U.S. ex rel. Bookwalter v. UPMC*,
    946 F.3d 162 (3d Cir. 2019).........................................................................................10

*In re Burlington Coat Factory Securities Litigation*,
    114 F.3d 1410 (3d Cir. 1997).......................................................................................18

*Combat Med., LLC v. Esper*,
    No. 1:19-CV-1609-TSE-JFA, 2020 WL 2115447 (E.D. Va. May 4, 2020).............3, 4, 5, 7

*Combat Medical v. Esper*,
    No. 1:19-CV-01609-TSE-JFA ........................................................................................3

*Composite Res., Inc. v. Combat Med. Sys., LLC*,
    No. 3:17-CV-72-MOC-DSC, 2020 WL 7365316 (W.D.N.C. Dec. 15, 2020) ...................2, 3

*U.S. ex rel. Doe v. John Doe Corp.*,
    960 F.2d 318 (2d Cir. 1992).........................................................................................21

*U.S. ex rel. Dunleavy v. Cnty. of Delaware*,
    123 F.3d 734 (3d Cir. 1997), *abrogated on other grounds by Graham Cnty.*
    *Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010).....................21

*U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*,
    660 F. Supp. 3d 381 (E.D. Pa. 2023) ........................................................................10, 11

*U.S. ex rel. Fine v. Advanced Sciences, Inc.*,
    99 F.3d 1000 (10th Cir. 1996) .....................................................................................20

*Foglia v. Renal Ventures Mgmt., LLC*,
    754 F.3d 153 (3d Cir. 2014).........................................................................................10

*Great W. Mining & Mineral Co. v. Fox Rothschild LLP*,
    615 F.3d 159 (2010).....................................................................................................10

*U.S. ex rel. Judd v. Quest Diagnostics Inc.*,
    638 Fed. App'x 162 (3d Cir. 2015)...............................................................................16

*U.S. ex rel. Kinney v. Stoltz*,
    327 F.3d 671 (8th Cir. 2003) ................................................................................21

*U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
    985 F.2d 1148 (2d Cir. 1993)................................................................................20

*QVC, Inc. v. Resultly, LLC*,
    159 F. Supp. 3d 576 (E.D. Pa. 2016) ...................................................................10

*U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*,
    769 F.3d 837 (3d Cir. 2014)..................................................................................19

*U.S. ex rel. Smith v. Yale Univ.*,
    415 F. Supp. 2d 58 (D. Conn. 2006).........................................................20, 21, 22

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
    2013 WL 4525226 (E.D. Pa. Aug. 27, 2013) .......................................................19

*State Farm Mut. Auto. Ins. Co. v. Ficchi*,
    2012 WL 1578247 (E.D. Pa. May 4, 2012) (Pratter, J.) .......................................18

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co.*,
    944 F.2d 1149 (3d Cir.1991)................................................................................20

*U.S. ex rel. Travis v. Gilead Scis., Inc.*,
    596 F. Supp. 3d 522 (E.D. Pa. 2022) .............................................................10, 11

*United States v. Kindred Healthcare, Inc.*,
    517 F. Supp. 3d 367 (E.D. Pa. 2021) ...................................................................16

*Universal Health Servs., Inc. v. United States*,
    579 U.S. 176 (2016)..............................................................................................10

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
    659 F.3d 295 (3d Cir. 2011)..................................................................................10

**Statutes**

31 U.S.C. § 3729(a)(1)(A) .......................................................................................5

31 U.S.C. § 3729(a)(1)(B) .......................................................................................5

31 U.S.C. §3730(d)(4) ............................................................................................22

31 U.S.C. § 3730(e)(4)......................................................................................11, 20

31 U.S.C. § 3730(e)(4)(B) ......................................................................................20

## INTRODUCTION

Relators are not whistleblowers with firsthand knowledge of fraud against the Government. Relators are Defendants' former competitors who tried—unsuccessfully—to replace the Combat Application Tourniquet ("CAT") as the approved primary tourniquet to be issued to soldiers.

Relators' prior litigation involving the CAT—against CAT Resources, LLC's ("Cat Resources") parent company Composite Resources, Inc. ("CRI")—allegedly delayed Relators' ability to profit from their own competing tourniquet, the "TMT." Relators' efforts in another lawsuit against the Government to undermine the DoD's endorsement of the CAT to the exclusion of the TMT failed. Relators' efforts—referenced in paragraphs 12—14 of the SAC—to gain traction with the FBI and Government regarding their claims against the CAT here failed.

Relators' claims in this proceeding were based on false allegations and highly relevant omissions. CAT Resources conferred with Relators, identifying and demonstrating the falsity of their allegations and detailing the omitted facts. Relators did nothing.

However, after being served with CAT Resources' motion to dismiss the First Amended Complaint (the "FAC")[1] and a Rule 11 notice,[2] Relators dropped their "unlawful substitution" claim. Rightly so, since—as Relators knew or should have known—the Government has used the same "item of supply" NSN for every CAT generation since 2004. This undisputable fact foreclosed materiality, and Relators' admission of prior public disclosure of the same allegations in the FAC were separately fatal to their "unlawful substitution" count, so they dropped it.

Relators' Second Amended Complaint ("SAC") Berry Amendment/TAA allegations are even further removed from Rules 12(b)'s and 9(b)'s standards of specificity and particularity than the FAC. The only "particular details" alleged in the FAC—two cardboard boxes of CATs with

---

[1] Doc. 48, 48-1.
[2] Exhibit 1.

CAT Resources' shipping labels reflecting an 11-digit CR "Supplier Item Number" and the initials "BMA" under "Packed By"[3]—have simply been deleted in the SAC. Relators' remaining allegations—that CAT Resources uses "only basic assembly equipment" and has no "automated manufacturing equipment"—are conclusory and based only on "information and belief." The SAC sets forth <u>no</u> specific facts upon which Relators' "belief" is reasonably based, so Relators' remaining count against CAT Resources should be dismissed.

## BACKGROUND

### I.   *CRI v. Combat Medical*

The Combat Application Tourniquet (the "CAT") was conceived in 2003 by special forces medic Mark Esposito. *Composite Res., Inc. v. Combat Med. Sys., LLC*, No. 3:17-CV-72-MOC-DSC, 2020 WL 7365316, at *1 (W.D.N.C. Dec. 15, 2020) ("*CRI v. Combat Medical*"). Esposito patented the technology embodied in the CAT and later sold it to CRI, which developed the process and capability for mass-producing the CAT. *Id.*

In February 2017, CRI filed a patent infringement case alleging that the Tactical Mechanical Tourniquet ("TMT") distributed by Combat Medical Systems, LLC ("Combat Medical") infringed CRI's CAT patent. *Id.*, at *1, 7. Relator Russ "founded" and Relator Murphy "worked at" Combat Medical.[4] Kutak Rock represented Combat Medical in *CRI v. Combat Medical*.

---

[3] According to the FAC, "CR" on the labels meant Chinese "Customs Registration," and "BMA" on the labels meant "Bahamas Maritime Authority." Doc. 12 ¶¶ 119–25. As CAT Resources pointed out in its motion to dismiss and Rule 11 notice, that would mean that CAT Resources—in an attempt to "disguise" the CAT's "Chinese origin"—shipped empty cardboard boxes made in North Carolina to either China or the Bahamas with pre-printed labels displaying Chinese origin. Doc. 48-1 at p. 2. Moreover, Chinese Customs Registration numbers have ten digits, not 11. *Id.* And the initials "BMA" were "insufficient factual matter" to support a presumption of truth to relators' contention that CAT Resource's boxes were repacked in the Bahamas with Chinese-made CATs, instead of packed with U.S.-made CAT tourniquets by a CAT Resources employee named Ben M. Adair in South Carolina. *Id.* at pp. 2–3. Relators have deleted these allegations in the SAC. Doc. 51-2 at 45–47.

[4] Doc. 55 at ¶¶ 3–4.

Combat Medical argued that the TMT did not infringe the CAT patent and, further, that the CAT patent was invalid. *Id.*, at *1. In December 2020, the court rejected Combat Medical's claim that the CAT patent was invalid, but held that the TMT did not infringe the CAT patent. *Id.* However, due in part to the litigation, Combat Medical was prevented from selling the TMT to the Department of Defense ("DoD") for several years. *Id.*, at *2.

## II.     *Combat Medical v. Esper*

During the pendency of *CRI v. Combat Medical*, on December 23, 2019, Combat Medical filed suit against the U.S. Army Medical Material Agency ("USAMMA") over the TMT. *Combat Med., LLC v. Esper*, No. 1:19-CV-1609-TSE-JFA, 2020 WL 2115447, at *1 (E.D. Va. May 4, 2020) ("*Combat Medical v. Esper*"). Combat Medical alleged that because of decisions made by the USAMMA, Combat Medical had been prevented from selling the TMT to any agency within the DoD. *Id.* Relator Corey Russ verified and Kutak Rock certified the complaint in *Combat Medical v. Esper*.[5] The *Esper* court noted: "NAR is one of Combat Medical's competitors." *Id.* at *2 n.4.

Combat Medical further alleged in *Esper* that in 2010, the DoD established a Tourniquet Working Group to develop standards for and evaluate the safety, efficacy, and physical requirements of tourniquets through a series of tests called the Joint Operational Evaluation of Field Tourniquets ("JOEFT"). *Id.*, at *2.  The JOEFT testing began with 13 different tourniquets and was conducted in four phases. *Id.* By the final phase in 2017, the three highest rated tourniquets remained in the JOEFT, including the seventh-generation CAT (the "CAT Gen 7") and the TMT. *Id.*

---

[5] No. 1:19-CV-01609-TSE-JFA, *Combat Medical, LLC v. Esper*, Doc. 1 (12/23/19).

On September 3, 2017, the final JOEFT test report was issued. *Id*. The report stated that the CAT (i) achieved the highest combined success rate, (ii) had the shortest application times, and (iii) was ranked as the most preferred tourniquet design. *Id*.

Combat Medical further alleged in *Esper* that on September 19, 2018, the USAMMA, an agency within the U.S. Army Medical Research and Material Command, issued Medical Material Quality Control Message ("MMQC") 18-2324. *Id*. The purpose of MMQC-18-2324 was to "inform all Army units that the Combat Application Tourniquet (CAT) is the chosen tourniquet for the U.S. Army in order to ensure our soldiers receive the best possible medical care." *Id*. MMQC-18-2324 further stated that: "The U.S. Army has completed extensive testing based on defined requirements to determine the extremity tourniquet which best meets the needs of the warfighter. The combat application tourniquet (cat) has met or exceeded all defined requirements, was the superior performer, and was reaffirmed as the chosen extremity tourniquet."

MMQC-18-2324 instructed that "[a]ny resupply kit previously procured that does not have the [CAT] must be canceled and the appropriate resupply kit procured, due to the inherent safety risk of an unauthorized tourniquet." *Id*., at *3 (quoting MMQC-18-2324). MMQC-18-2324 further directed Army units to work with the USAMMA and the Defense Logistics Agency ("DLA") "to stop the procurement of two specific first aid kits identified by their National Stock Numbers ('NSN')." *Id*. (same). Both first aid kits identified in MMQC-18-2324 were manufactured by Combat Medical and contained the TMT. *Id*. MMQC-18-2324 states that these kits "have a tourniquet in them that is not approved for Army use or procurement." *Id*. (quoting MMQC-18-2324).

In *Esper*, Combat Medical, through a pleading verified by relator Russ, alleged that the MMQC-18-2324 had caused the cancellation of orders for the TMT and effectively barred Combat

Medical from selling tourniquets to the Army. *Id*. On May 4, 2020, the U.S. District Court for the Eastern District of Virginia dismissed Combat Medical's claims for want of jurisdiction, holding that Combat Medical's NSN-related claims had been brought "in connection with a procurement or proposed procurement." *Id*., at *6. Therefore, Combat Medical's claims were within the exclusive jurisdiction of the Court of Federal Claims. *Id*.

## III. The Instant Qui Tam Action

After the Government declined to intervene and Relators' original complaint was unsealed, Relators filed their FAC, alleging two counts against CAT Resources: (1) "Unlawful Substitution of the CAT Gen 7 for the CAT Gen 6" under 31 U.S.C. § 3729(a)(1)(A)[6]; and (2) "False Certification of Compliance with Berry Amendment and TAA" under 31 U.S.C. § 3729(a)(1)(B).[7]

As to Count 1, the FAC alleged that CAT Resources "[unlawfully] substitute[ed] the CAT Gen 7 for the CAT Gen 6."[8] The linchpin of the FAC's Count 1 was that "Defendants used the NSN 6515-01-521-7976, which is the Government's *unique identifier* for the CAT Gen 6, when referring to the CAT Gen 7."[9]

Count 1 of the FAC also relied on "MMQC-16-1284," a 2016 Medical Materiel Quality Control Message issued by the U.S. Army Medical Materiel Agency ("USAMMA").[10] According to Relators, MMQC-16-1284 "highlighted Defendants' derogation of basic principles of Government logistics practice" and "warned that soldiers who received the CAT Gen 7 may not

---

[6] Doc. 12 at 48. Subsection (a)(1)(A) imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.
[7] Doc. 12 at 53. Subsection (a)(1)(B) imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.
[8] Doc. 12 ¶ 90.
[9] Doc. 12 ¶ 174 (emphasis added).
[10] Doc. 12 ¶¶ 85–96.

be able to adequately render first aid in case of emergency because of their unfamiliarity and lack of training with the CAT Gen 7."[11]

In the FAC's Count 2, Relators alleged that CAT Resources "deceptively conceal[ed] the Chinese origin of" the CAT through a "complex repackaging scheme" used because of a lack of "sufficient manufacturing capacity" in the U.S.[12] Relators surmised that the CAT *had* to be made *in China* because:

1. Relators' "agents" at two U.S. military bases photographed two cardboard boxes of CATs (the "Fort Bragg Box" and the "Lewis-McCord Box") that had the letters "CR" and "BMA" on them, which Relators claimed—based on their "knowledge of Chinese and Bahamian customs and shipping practices"—stood for Chinese "Customs Registration" and "Bahamas Maritime Authority"; and

2. Relators saw "publicly available video footage first aired in March 2020," allegedly depicting that CAT Resources' South Carolina facilities "are not sufficient to produce CATs at the pace Defendants claim."[13]

## IV. CAT Resources highlights Relators' and their counsel's omission of known key facts and demonstrates the falsity of the FAC's central allegations and the applicability of the public disclosure bar.

On February 16, 2024, CAT Resources sent a letter to Relators providing proof that their allegations in the FAC were false.[14] CAT Resources showed Relators that NSN 6515-01-521-7976 was not unique to the CAT Gen 6, but rather had been assigned by the DoD to the CAT in 2004, and thus used for at least CAT Generations 3–7.

---

[11] Doc. 12 ¶¶ 86–87.
[12] Doc. 12 ¶ 196.
[13] Doc. 12 ¶¶ 148–50.
[14] Exhibit 2.

CAT Resources also referred Relators to their own pleadings and exhibits in *Esper* where Relators attacked the ***2018*** MMQC because it "reaffirm[ed]" and endorsed the CAT Gen 7 as the military's "chosen extremity tourniquet."[15] In other words, Relators omitted from the FAC that more than two years after MMQC-16-1284, the USAMMA had issued *another* MMQC, expressly declaring, reaffirming, endorsing, and recommending the CAT Gen 7 as the "only army approved individual soldier tourniquet for individual carry,"[16] fatally undermining False Claims Act materiality.

Relators obviously had subjective knowledge of these facts, having alleged them in prior litigation. Relator's counsel had subjective knowledge of these facts as well, as Kutak Rock represented Relators in the *Esper* lawsuit and the effort to undermine the CAT.[17]

CAT Resources further showed that since MMQC-16-1284 was a prior public disclosure of the same facts Relators alleged in the FAC, Count 1 was barred by the public disclosure doctrine.

As for Count 2, CAT Resources showed Relators that: (1) "CR" stood for "CAT Resources," not Chinese "Customs Registration"; (2) Chinese Customs Registration numbers have ten digits, not 11; and (3) "CR-007703-02-000" was simply CAT Resources' internal item number for the black CAT tourniquet.[18] CAT Resources also explained that "BMA" were the initials of CAT Resources' employee Ben M. Adair, who had packed the boxes in South Carolina.[19]

CAT Resources also provided screenshots of documents proving this to be true— employment forms and manufacturing and packaging records.[20] CAT Resources further reminded Relators that—as to their allegations of CAT Resources' inability to produce CATs at a

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*

"sufficient" rate in the U.S.—their reliance solely on publicly available video footage from a 2020 newscast triggered the public disclosure bar, rendering Count 2 unsupportable.[21]

## V. Relators delay six weeks before dropping Count 1 and re-alleging Count 2 "on information and belief."

On February 20, 2024, Relators responded that they were "looking into the issues" raised in CAT Resources' February 16, 2024 letter and considering "whether dismissal or amendment is appropriate."[22] On February 22, 2024, CAT Resources asked whether Relators had finished their review and consideration of CAT Resources' February 16, 2024 letter. Relators responded that they did "not have any additional updates at this time."[23] CAT Resources filed its motion to dismiss under Rules 9(b) and 12(b)(6).[24]

On March 11, 2024, with CAT Resources' agreement, the Court granted Relators an additional three weeks—giving them a total of six weeks—to respond to CAT Resources' motion to dismiss.[25]

On March 15, 2024, CAT Resources served Relators with notice of a motion for sanctions pursuant to Rules 11(c)(2) and 5.[26]

On March 26, 2024—almost six weeks after receiving CAT Resources' letter and 11 days after being served with notice of CAT Resources' motion for sanctions—Relators advised CAT Resources that Relators intended to amend the FAC and requested CAT Resources' consent.[27] Relators did not provide a description of their amendment or how they intended to address the

---

[21] *Id.*
[22] Exhibit 3.
[23] Exhibit 4.
[24] Doc. 48.
[25] Doc. 49.
[26] Exhibit 1.
[27] Exhibit 5.

grounds for dismissal set forth in CAT Resources' motion. CAT Resources asked to see the proposed SAC before CAT Resources could determine whether to consent.[28] Relators did not respond.

On April 5, 2024, Relators filed their motion for leave to amend/correct the FAC.[29] Relators acknowledged that CAT Resources had asked to review the proposed SAC before determining whether to consent, "but Plaintiffs were not in a position to provide that draft until" April 5, the day of the filing.[30]

In the proposed SAC, Relators removed Count 1, but continued to allege Count 2 (renumbered as Count 1)—"False Certification of Compliance with Berry Amendment and TAA"[31]—based on the same alleged "complex repackaging scheme" and lack of "sufficient manufacturing capacity" referenced in the FAC.

On April 24, 2024, the Court granted Relators' motion to amend/correct amended complaint.[32] On May 2, 2024, Relators filed the SAC.[33]

## STANDARD OF DECISION

The Second Amended Complaint ("SAC") should be dismissed as to CAT Resources under 12(b)(6) for failure to state a claim, under Rule 9(b) for failing to meet the particularity requirement, and under the public disclosure bar. To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Where a complaint

---

[28] *Id.*
[29] Doc. 51.
[30] Doc. 51-1 at 3 n.2
[31] Docs. 51-2 at 61(Proposed SAC) and 55 at 38 (SAC).
[32] Doc. 54.
[33] Doc 55.

pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (2010) (quoting *Twombly*, 550 U.S. at 556–57 (internal quotation marks omitted)); *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 583 (E.D. Pa. 2016). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." *U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381, 392 (E.D. Pa. 2023).

Because a claim under the FCA sounds in fraud, "False Claims Act plaintiffs must also plead their claims with plausibility and particularity under [Rule] 9(b)." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016); Fed. R. Civ. P. 9(b). "Rule 9(b)'s particularity requirement requires a plaintiff to allege 'all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where, and how of the events at issue.'" *U.S. ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (citation omitted). For relators to satisfy Rule 9(b)'s pleading requirement, "it is sufficient for a plaintiff to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014) (quotation omitted); *U.S. ex rel. Travis v. Gilead Scis., Inc.*, 596 F. Supp. 3d 522, 535 (E.D. Pa. 2022).

Generally, to state a claim under the FCA, a relator must allege facts sufficient to satisfy four elements: (1) a false statement or fraudulent course of conduct; (2) made knowingly (scienter); (3) that was material, (4) causing the Government to pay out money or forfeit moneys due. *Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016) (materiality); *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295,

302 (3d Cir. 2011) (falsity, causation, knowledge). Even so, if there is a qualifying "public disclosure" and the relator is not an "original source" such claims must be dismissed under 31 U.S.C. § 3730(e)(4). *U.S. ex rel. Ellsworth Assoc., LLP*, 660 F. Supp. 3d at 394; *U.S. ex rel. Travis v. Gilead Scis., Inc*., 596 F. Supp. 3d 522, 536 (E.D. Pa. 2022).

## ARGUMENT

In the SAC, Relators dropped Count 1, "Unlawful Substitution of the CAT Gen 7 for the CAT Gen 6."[34] However, the proposed SAC continues to allege Count 2 (renumbered as Count 1)—"False Certification of Compliance with Berry Amendment and TAA"[35]—based on the same alleged "complex repackaging scheme" and lack of "sufficient manufacturing capacity" referenced in the FAC.

In the FAC, the only "facts" alleged against CAT Resources as to the "complex repackaging scheme" were the Fort Bragg and Lewis-McChord Boxes and Relators' contention that the boxes' markings indicated Chinese origin. The only "fact" in the FAC as to CAT Resources' alleged lack of "sufficient manufacturing capacity" was "publicly available video footage first aired in March 2020," allegedly showing that CAT Resources' "manufacturing facilities are not sufficient to produce CATs at the rate Defendants claim [15,000 per day], particularly given its lack of automated manufacturing equipment."[36]

In the SAC—in response to CAT Resources' February 16, 2024 letter, February 22, 2024 motion to dismiss, and the Rule 11 motion served on March 15, 2024—Relators simply deleted their:

---

[34] Doc. 51-2 at 56–61.

[35] Docs. 51-2 at 61 (Proposed SAC) and 55 at 38 (SAC).

[36] Doc. 12 ¶¶ 116–50.

1. allegations that "CR" and "BMA" on the Fort Bragg and Lewis-McChord Boxes stand for Chinese "Customs Registration" and "Bahamas Maritime Authority"[37]; and

2. reference to the "publicly available video footage first aired in March 2020" allegedly depicting that "CATR's portion of the Rock Hill Facility contains only basic equipment" and CAT Resources' employees "assembling CATs largely by hand."[38]

After Relators were given six weeks to cure their pleading deficiencies, no new facts were plead or alleged. Rather, Relators removed their previously alleged facts and replaced them with "information and belief."

## I. Deleting the FAC's false Chinese "Customs Registration" and "Bahamas Maritime Authority" allegations does not salvage Relators' "complex repackaging scheme" allegations in the SAC.

The only remaining "facts" alleged in the SAC underlying Relators' "complex repackaging scheme" allegations are as follows:

- "On or about January 15, 2021, Plaintiff-Relators' agents observed a box filled with CATs ('Fort Bragg Box') in a supply room in Fort Bragg, an Army facility on Fayetteville, North Carolina."[39]

- "The Fort Bragg Box bore a number of shipping labels. One label was printed with NAR's logo and stated 'Ship to' the address of NAR's headquarters in Greer, South Carolina. No shipper is identified on this label; the only company referenced is NAR itself. This label also stated '1 of 40' and '250 Tourniquets.'"[40]

- "A second label indicated the Fort Bragg Box had been shipped to Fort Bragg by NAR from its address in Greer, South Carolina. This label contained a UPS Ground tracking number."[41]

- "Another label bore the phrase, 'MADE IN U.S.A.' in large print along with a prominent, stylized American flag symbol."[42]

---

[37] Doc. 51-2 at 45–47.
[38] Doc. 51-2 at 51.
[39] Doc. 55 ¶ 87.
[40] Doc. 55 ¶ 88.
[41] Doc. 55 ¶ 89.
[42] Doc. 55 ¶ 90.

- "A 'Made in U.S.A.' marking creates the impression that the items contained in the box were all or virtually all of U.S.-origin. *As described above*, NAR has received substantial quantities of CATs from China, and some or all of the items delivered to the Government in the Fort Bragg Box contained Chinese-origin materials."[43]

- "Plaintiff-Relators' agents identified another box containing CATs ('Lewis-McChord Box') in a storage room located at Joint Base Lewis-McChord, a joint Army and Air Force installation approximately nine miles outside of Tacoma, Washington."[44]

- "Like the Fort Bragg Box, the Lewis-McChord Box bore a label containing NAR's logo and address as well as a second label bearing CATR's name associated with a Greer, South Carolina address."[45]

- "Finally, the Lewis-McChord Box bore a label deceptively claiming its contents were 'Made in U.S.A', when in fact they were made in China and repackaged before being trans-shipped to NAR's facility in Greer, South Carolina."[46]

- "As with the Fort Bragg Box, the deceptive nature of the 'Made in U.S.A.' label on the Lewis-McChord Box was apparent only with significant knowledge of NAR's international supply chain and trans-shipment practices."[47]

- "The Fort Bragg Box and Lewis-McChord Box are both typical of the boxes used by … CAT [Resources] to import goods from China into the United States and deceive DoD into accepting their Chinese-made goods as though they had genuinely been manufactured in the United States. From 2015 through the present, numerous other similarly-labeled boxes were used by NAR and CAT [Resources] first, to import CATs from China and then, second, to fraudulently supply those Chinese-made CATs and medical kits containing Chinese-made CATs to DoD."[48]

- "In a further effort to conceal the Chinese origin of the CATs Defendants sold to DoD, Defendants caused the CATs they sold to DoD to bear no country-of-origin markings either on the CATs themselves or on their immediate packaging. Pursuant to Section 304 of the Tariff Act of 1930, as amended, federal law requires Chinese-made CATs to be marked in a way that clearly identifies them as being of Chinese origin. Defendants knowingly sold CATs that lack any country-of-origin markings to DoD as part of their scheme to evade the strictures of the Berry Amendment and TAA."[49]

---

[43] Doc. 55 ¶ 91 (emphasis added).
[44] Doc. 55 ¶ 93.
[45] Doc. 55 ¶ 94.
[46] Doc. 55 ¶ 95.
[47] Doc. 55 ¶ 96.
[48] Doc. 55 ¶ 97.
[49] Doc. 55 ¶ 98.

- "CAT [Resources] cause[s] the boxes they use to ship the goods they sell to DoD to prominently bear the label 'Made in U.S.A.', despite their goods' actual origin in China. These 'Made in U.S.A.' labels denote the goods contained in the boxes so labeled are produced in the United States and consist of all or virtually all U.S.-origin materials. These labels therefore constitute representations that the contents of these boxes comply with the Berry Amendment and TAA."[50]

The Fort Bragg and Lewis McChord Boxes bear markings showing that the cardboard boxes themselves were manufactured by Ferguson Box in Charlotte, North Carolina:



CAT Resources is located in Rockhill, South Carolina, a suburb of Charlotte.

The Fort Bragg and Lewis McChord Boxes' shipping labels reflect South Carolina and North Carolina addresses and the phrase "MADE IN U.S.A." Nothing on either box remotely suggests—much less reasonably supports an inference—that it was shipped from China or that its contents were Chinese-made. Any suggestion that these Charlotte, North Carolina cardboard boxes

---

[50] Doc. 55 ¶ 102.

are "typical of the boxes" used by CAT Resources to "import goods from China" and "fraudulently supply those Chinese-made CATs and medical kits containing Chinese-made CATs to DoD" is beyond implausible.

In paragraph 91, Relators contend that "MADE IN U.S.A." *must be* false because, "[a]s *described above*, NAR has received substantial quantities of CATs from China, and some or all of the items delivered to the Government in the Fort Bragg Box contained Chinese-origin materials."[51] But the full extent of the SAC's "descri[ption] above" is Paragraph 20, which is no "description" at all:

> Between 2015 and the present time, … NAR and CAT [Resources] delivered CATs to the Government containing materials produced in the People's Republic of China ('China'). NAR and CAT [Resources] also manufactured at least some of these products in China. The applicable country of origin requirements, and the violation thereof, are *discussed more fully below*.[52]

Paragraph 91 represents that the particular facts supporting the conclusions in Paragraph 91 are "described above," and Paragraph 20 represents that the particular facts supporting the conclusions in Paragraph 20 are "discussed more fully below." Both are false, and Relators' vague and circular cross-referencing of conclusory statements does not make them sufficient to state a claim.

Nor are Relators' vague references to NAR's alleged "trans-shipment practices" sufficient to state a claim that the CAT is "Chinese-made." And Relators' allegation that the Fort Bragg and Lewis-McChord Boxes are "typical of the boxes used by … CAT [Resources] to import goods from China into the United States and deceive DoD into accepting their Chinese-made goods" is based entirely on the premise that the Fort Bragg and Lewis-McChord Boxes were in fact shipped

---

[51] Doc. 55 ¶ 91 (emphasis added).
[52] Doc. 55 ¶ 20 (emphasis added).

from China or contained Chinese-made CATs—again a circular conclusion. There are no *facts* in the SAC that would allow the Court to reasonably draw either inference.

Similarly, Relators' allegation that CAT Resources has concealed the Chinese origin of the CAT by not marking the CAT with China as the country-of-origin pre-supposes the CAT *is* made in China. But again, Relators plead no facts from which to reasonably draw that inference.[53]

Crucially, Relators generally allege that they "have direct and independent knowledge of the information" contained in the SAC,[54] but they do not allege specific facts—as opposed to mere conclusions—showing how and when they learned that "information." *See United States v. Kindred Healthcare, Inc.*, 517 F. Supp. 3d 367, 385 (E.D. Pa. 2021); *U.S. ex rel. Judd v. Quest Diagnostics Inc.*, 638 Fed. App'x 162, 167−68 (3d Cir. 2015) (citation omitted) (holding that relator's "bare assertion" he had firsthand knowledge of the defendants' fraudulent scheme was not sufficient to overcome the public disclosure bar because "'[t]o establish original source status knowledge, a qui tam plaintiff must allege specific facts—as opposed to mere conclusions— showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint'"). As such, Relators' bare legal conclusion that they are an independent and direct source of their allegations is not afforded a presumption of truth. *Kindred Healthcare*, 517 F. Supp. 3d at 385; *Judd*, 638 Fed. App'x at 168.

## II. Substituting the FAC's reference to publicly available video footage with "on information and belief" does not salvage Count 2 (renumbered Count 1).

As for the "factual" content of Relators' allegation that the CAT is made in China, the best Relators can do—again, employing their strategy of vaguely gesturing to facts purportedly pled "above" or "below"—is to characterize the CAT's U.S.-manufacture as "suspicious," based on an

---

[53] Relators do not allege violation of Section 304 of the Tariff Act as a basis for their claim of false certification of compliance with the Berry Amendment and TAA.
[54] Doc. 55 ¶ 14.

alleged lack of "sufficient manufacturing capacity."[55] But what Relators "describe below" fails to meet the particularity requirement:

- "CAT [Resources] and Composite Resources maintain a 55,000 square foot manufacturing facility at 483 Lakeshore Parkway, Rock Hill, South Carolina ('Rock Hill Facility')."[56]

- "CAT [Resources] occupies a portion of one floor of the Rock Hill Facility, about 12,000 square feet of space in total, where it claims that it manufactures the CAT. ***Upon information and belief***, this facility contains only basic assembly equipment, and it [sic] not sufficient to manufacture the volume of tourniquets that CAT [Resources] [is] selling to the Government."[57]

- "Despite the lack of automated manufacturing equipment, CAT [Resources] has previously stated that it manufactures approximately 15,000 CAT tourniquets per day in its portion of the Rock Hill Facility. To meet this product rate, CAT [Resources] would need to continually produce approximately 10.5 CATs per minute."[58]

- "CAT [Resources]'s facilities are not sufficient to produce CATs at the pace NAR or CAT [Resources] claim, particularly given CAT [Resources]'s lack of automated manufacturing equipment."[59]

- "***Upon information and belief***, … CAT [Resources] [does not] have any other manufacturing facilities in the United States. Instead, to meet DoD's remaining demand for CAT tourniquets, … CAT [Resources] … source[s] a large number of CATs from China that are manufactured in China and contain materials produced in China."[60]

Relators' allegation that CAT Resources only uses 12,000 square feet of the Rock Hill Facility to manufacture the CAT is wholly unsupported. But according to the SAC, that allegation, plus an allegation on "information and belief" that there is no "automated manufacturing equipment" (whatever that means) in that 12,000-square foot space, means the CAT is made not only elsewhere, but in *China*. That does not pass the pleading standard.

---

[55] Doc. 55 ¶ 107.
[56] Doc. 55 ¶ 110.
[57] Doc. 55 ¶ 111 (emphasis added).
[58] Doc. 55 ¶ 112.
[59] Doc. 55 ¶ 113.
[60] Doc. 55 ¶ 114 (emphasis added).

Presumably in an attempt to meet the pleading standard, the SAC simply deletes the following allegation that Relators had included in the FAC —:

> ~~148.  As depicted in publicly available video footage first aired in March 2020, CATR's portion of the Rock Hill Facility contains only basic equipment. Individual workers are depicted assembling CATs largely by hand.~~

Unfortunately for Relators, that allegation walked them right into the public disclosure bar. Relators' solution: delete it and rely on "information and belief." This deletion begs the question which Relators must answer to survive Rule 9(b) dismissal—upon what facts is this supposed "information and belief" based?

Rule 9(b) permits pleading "based upon information and belief," particularly where key factual information remains within the defendant's control. *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1418 (3d Cir. 1997). But such allegations are permissible "only if the pleading sets forth specific facts upon which the belief is reasonably based." *State Farm Mut. Auto. Ins. Co. v. Ficchi*, 2012 WL 1578247, at *5 (E.D. Pa. May 4, 2012) (Pratter, J.).

The SAC fails to set forth any facts—much less specific facts—upon which Relators' belief is reasonably based that CAT Resources uses "only basic assembly equipment," has no "automated manufacturing equipment," and cannot meet DoD's demand for the CAT using CAT Resources' South Carolina facilities. This is highlighted by the fact that Relators previously based these allegations on "publicly available video footage first aired in March 2020"—i.e., a public disclosure. Despite the six weeks Relators had to amend their complaint, they offer no alternative basis in the SAC for the same restated belief.

This cursory allegation, made on "information and belief" alone, is critical to Relators' claim that the CAT is made in China. Accordingly, Relators' SAC is deficient. As Judge Buckwalter held in another FCA case, "cursory allegations, made on information and belief alone, are unquestionably insufficient to open the door to broad and burdensome discovery." *U.S. ex rel. Spay v. CVS Caremark Corp.*, 2013 WL 4525226, at *2 (E.D. Pa. Aug. 27, 2013).

Moreover, district courts in this Circuit oblige plaintiffs even in the pleading stage of FCA actions to provide a statement of efforts undertaken to obtain information from the opposing party. *See U.S. ex rel. Bartlett v. Tyrone Hosp., Inc.*, 234 F.R.D. 113, 122 (W.D. Pa. 2006) (granting defendants' motion to dismiss). Relators have never undertaken any efforts to obtain information from CAT Resources regarding the Rock Hill Facility. Relators have never been to the facility, and they have never asked CAT Resources for any information regarding its CAT "manufacturing capacity."

Moreover, Relators have deleted their prior reference to publicly available video footage from a 2020 newscast, which was the closest—although still deficient—thing they had to a "specific fact" upon which to base a belief. Relators are left with no facts to support their "manufacturing capacity" belief, rendering it legally unsupportable.

## III.    Relators have not and cannot sufficiently plead their qualification as original sources.

"Direct knowledge" is knowledge obtained without any "intervening agency, instrumentality, or influence: immediate." *U.S. ex rel. Schumann v. Astrazeneca Pharms. L.P.*, 769 F.3d 837, 845 (3d Cir. 2014). Such knowledge has also been described as "first-hand, seen with the relator's own eyes, unmediated by anything but [the relator's] own labor, and by the relator's own efforts, and not by the labors of others, and ... not derivative of the information of others." *Id.*

19

One cannot qualify as an "original source" if "a third party is the source of the core information upon which a qui tam complaint is based." *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 72 (D. Conn. 2006) (citation omitted) (internal quotation marks omitted). Merely possessing background information which enables the relator to understand the significance of a publicly disclosed transaction or allegation, however, is insufficient. *Id*. As the Third Circuit stated in *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Insurance Co*., 944 F.2d 1149, 1155–56 (3d Cir.1991), § 3730(e)(4) was "designed to preclude qui tam suits based on information that would have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *See U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp*., 985 F.2d 1148, 1158−59 (2d Cir. 1993) ("[The qui tam plaintiff] had no significant direct knowledge ... and certainly was not a source of that information ... The fact that [the qui tam plaintiff] conducted some collateral research and investigations ... does not establish 'direct and independent knowledge of the information on which the allegations are based' within the meaning of § 3730(e)(4)(B).").

The issue of how Relators obtained their knowledge is thus essential to their qualification as an original, as opposed to a secondary, source. *See U.S. ex rel. Smith v. Yale Univ*., 415 F. Supp. 2d 58, 74 (D. Conn. 2006). For Relators' knowledge to be "independent," it "must not be derivative of the information of others, even if those others may qualify as original sources." *See U.S. ex rel. Fine v. Advanced Sciences, Inc*., 99 F.3d 1000, 1007 (10th Cir. 1996) (holding that relator "did not qualify as an original source because his knowledge was secondhand and derivative of the information generated by [others] who actually ... uncovered the facts").

Based on the SAC and Relators' April 19, 2024 Rule 26(e) Supplemental Disclosures, Relators unquestionably obtained their alleged "knowledge" regarding "the matters described in

this Second Amended Complaint"[61] from third parties, including the "Report prepared by Timothy Gallagher and Kroll, Inc."[62] As a matter of law, Relators cannot claim to be an original source of information derived from third parties. *See U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992) (discussing the purpose of the 1986 amendments to the FCA as "strik[ing] a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud"); *U.S. ex rel. Kinney v. Stoltz*, 327 F.3d 671, 674 (8th Cir. 2003) ("The [FCA] ... is not intended to create windfalls for people with secondhand knowledge of the wrongdoing.").

To be an original source, Relators must have direct and independent knowledge of facts, not mere suspicions of illegal conduct. *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 81 (D. Conn. 2006). Relators have failed to sufficiently allege direct and independent knowledge, rather than being based on information from "Timothy Gallagher and Kroll, Inc." *Id.* ("[T]he evidence on the record does not establish that Relator's knowledge was direct and independent rather than being based on information discovered … from the Hogan & Hartson investigative report.").

Relators do not even claim to have firsthand knowledge of the Fort Bragg or Lewis-McChord Boxes, instead relying secondhand on the so-called "observations" of unidentified "agents." *See U.S. ex rel. Dunleavy v. Cnty. of Delaware*, 123 F.3d 734, 740 (3d Cir. 1997), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010) ("Congress was mindful of the need 'to encourage persons *with firsthand knowledge* of fraudulent misconduct to report fraud.'" (emphasis added)). Relators do

---

[61] Doc. 55 at p.6 n.2.
[62] Exhibit 6, April 19, 2024 Rule 26(e) Supplemental Disclosures at 4 (describing "Report prepared by Timothy Gallagher and Kroll, Inc." as a document "used to support Plaintiffs' claims").

not explain how it came to be that their "agents"—who were apparently *not* "Army personnel"—accessed and searched U.S. Army base supply rooms for boxes of CATs, which they then apparently photographed for Relators.

Likewise, Relators do not claim to have been in CAT Resources' facilities. To CAT Resources' knowledge, they have not. Relators do not have direct, firsthand knowledge of what equipment CAT Resources has or whether it is in fact "sufficient" to manufacture 15,000 CATs per day.

Relators have failed to show that they would have knowledge of the alleged fraud without information obtained from other sources. *See U.S. ex rel. Smith*, 415 F. Supp. 2d at 81 ("The decisive element, however, is the fact that Relator has simply failed to show that he would have had knowledge of the fraud without the information obtained from other sources."). Relators have not demonstrated "direct and independent knowledge" of the core information on which the qui tam complaint is based, so the SAC should be dismissed. *See id*. ("Without a stronger showing, this Court cannot find that Relator has 'direct and independent knowledge' of the core information on which the qui tam complaint is based.").

## CONCLUSION

For the foregoing reasons, CAT Resources requests that the Court grant this motion and dismiss the Second Amended Complaint. CAT Resources further requests that the Court order relators to reimburse CAT Resources for its fees and costs under 31 U.S.C. §3730(d)(4).

This 16th day of May, 2024            Respectfully submitted,

By:     */s/ Michael Kaeske*
        Michael Kaeske (*admitted pro hac vice*)
        KAESKE LAW FIRM
        1301 W. 25th Street, Suite 400
        Austin, TX 78705
        (512) 366-7300

mmkaeske@kaeskelaw.com;
mikekaeske@gmail.com

Austin A. Evans (PA 201152)
KING & SPALDING LLP
500 West 2nd Street, Suite 1800
Austin, TX 78701
(512) 457-2069
aevans@kslaw.com
*Attorney for C-A-T Resources, LLC*

Jeffrey M. Telep (*admitted pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
(202) 626-2390
jtelep@kslaw.com
*Attorney for C-A-T Resources, LLC*

Paul B. Murphy (*admitted pro hac vice*)
Christopher C. Burris (*admitted pro hac vice*)
Stephen P. Cummings (*admitted pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
(404) 572-4600
pmurphy@kslaw.com
cburris@kslaw.com
scummings@kslaw.com

Jeremy C. Martin (*admitted pro hac vice*)
MARTIN APPEALS PLLC
200 Crescent Court, Suite 1040
Dallas, TX 75201
(214) 488-5021
jmartin@martinappeals.com

*Attorneys for C-A-T Resources, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel for Defendant C-A-T Resources, LLC hereby certifies that a true and correct copy of the foregoing was filed with the Court and served electronically through the CM-ECF system to all counsel of record registered to receive a Notice of Electronic Filing for this case.

This 16th day of May, 2024                    Respectfully submitted,

*/s/ Michael Kaeske*
Michael Kaeske (*admitted pro hac vice*)
KAESKE LAW FIRM
1301 W. 25th Street, Suite 400
Austin, TX 78705
(512) 366-7300
mmkaeske@kaeskelaw.com;
mikekaeske@gmail.com

*Attorney for C-A-T Resources, LLC*

24